<pre>
 1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MINNESOTA
 2
      ------------------------------------------------------------
 3                                      )
      United States of America,         )   File No. 22-CR-136
 4                                      )   (JNE/DTS-1)
              Plaintiff,                )
 5                                      )
      vs.                               )   Minneapolis, Minnesota
 6                                      )   February 7, 2023
      Derrick Maurice Scott,            )   Courtroom 12W
 7                                      )   9:00 a.m.
              Defendant.                )
 8    ------------------------------------------------------------
 9
           BEFORE THE HONORABLE JOAN N. ERICKSEN, and a Jury
10               UNITED STATES DISTRICT COURT JUDGE
                      (JURY TRIAL - VOLUME 2)
11
      APPEARANCES
12    For the Plaintiff:         Assistant United State Attorney
                                 TOM HOLLENHORST, AUSA
13                               CHELSEA WALCKER, AUSA
                                 300 South Fourth Street
14                               Suite 600
                                 Minneapolis, Minnesota 55415
15
      For the Defendant:         DeVore Law Office
16                               KEVIN W. DEVORE, ESQ.
                                 724 Bielenberg Drive
17                               Suite 110
                                 Woodbury, MN 55125
18
19    Court Reporter:            MARIA V. WEINBECK, RMR-FCRR
                                 1005 U.S. Courthouse
20                               300 South Fourth Street
                                 Minneapolis, Minnesota 55415
21
22
23        Proceedings reported by court reporter; transcript
      produced by computer.
24
25
</pre>

1                          **I N D E X**

                                                              PAGE
2

      **KAAREN SIMON**
3
          Direct Examination                                  236
4         Cross Examination                                   248

5     **DENIS OTTERNESS**

6         Direct Examination                                  249
          Cross Examination                                   270
7
      **CLOSING ARGUMENTS BY MS. WALCKER**                    280
8
      **CLOSING ARGUMENTS BY MR. DEVORE**                     294
9
      **REBUTTAL ARGUMENTS BY MS. WALCKER**                   301
10
      **FINAL JURY INSTRUCTIONS**                             305
11
      **JURY VERDICT**                                        325
12

13

14    **GOVERNMENT**                                        **REC'D**
          18                                                  244
15

16

17

18

19

20

21

22

23

24

25

1    **P R O C E E D I N G S**

2                        (8:10 a.m.)

3            THE COURT:  Good morning, everybody.  Please be

4    seated.  And, Government, I believe we are ready for your

5    next witness.

6            MS. WALCKER:  Good morning, Your Honor.  The

7    government calls Forensic Scientist Kaaren Simon to the

8    stand.

9                          **KAAREN SIMON,**

10           After having been first duly sworn, testified upon

11   the oath, as follows:

12           THE COURT:  Please take the witness stand.

13           MS. WALCKER:  May I inquire?

14           THE COURT:  Please.

15                      **DIRECT EXAMINATION**

16   BY MS. WALCKER:

17   Q.  Good morning, Ms. Simon.  How are you this morning?

18   A.  I'm fine, thank you.

19   Q.  Ms. Simon, where are currently employed?

20   A.  I work at the Minnesota Bureau of Criminal Apprehension.

21   Also, known as the BCA.

22   Q.  What is the Bureau of Criminal Apprehension or the BCA?

23   A.  It is part of the Department of Public Safety and

24   assists law enforcement agencies across the state to solve

25   and prevent crimes.

1    Q.  Are you employed in a particular department at the BCA?

2    A.  Yes.  I work in the biology section of the forensic

3    laboratory.

4    Q.  What does the BCA's forensic laboratory do?

5    A.  The laboratory receives evidence from different crimes,

6    and we analyze that evidence.

7    Q.  What is your role in the BCA forensic lab?

8    A.  I analyze the evidence and look for bodily fluids, such

9    as semen, saliva and blood, and then I will analyze that

10   evidence to generate DNA profiles.

11   Q.  And how long have you -- and that's the role of the

12   forensic scientist; is that's correct?

13   A.  Yes.

14   Q.  How long have you been in the role of forensic

15   scientist?

16   A.  Five years.

17   Q.  Can you tell the jury a little bit about your

18   educational background?

19   A.  I have a Bachelor's of Science degree in Biology from

20   the University of Minnesota-Duluth and a Forensic Science

21   Certificate from Hamline University.

22   Q.  Have you received any specialized training in the area

23   of DNA testing to become a forensic scientist?

24   A.  Yes.

25   Q.  And can you describe that training for the jury, please?

1    A.  Upon being hired at the BCA, I went through an extensive

2    training process, which involved observing other scientists

3    in the lab, reading relevant journal articles and taking

4    oral and written exams.

5    Q.  And, Ms. Simon, before you have a microphone, that

6    microphone is actually adjustable, do you mind for the

7    benefit of the court reporter move it closer, thank you so

8    much.  And, Ms. Simon, have you testified as an expert

9    previously in a case regarding DNA testing?

10   A.  Yes.

11        MS. WALCKER:  Your Honor, at this point we tender

12   Ms. Simon as an expert in DNA testing.

13        THE COURT:  She can go ahead and testify.

14        MS. WALCKER:  Thank you, Your Honor.

15   BY MS. WALCKER:

16   Q.  Ms. Simon, before we talk about the DNA testing you

17   performed in this case, I'm going to talk a little bit about

18   the science of DNA.  To start with, can you tell us what is

19   DNA?

20   A.  DNA is the chemical blueprint that makes a person who he

21   or she is.  Half the DNA comes from the mother and half from

22   the father.

23   Q.  And a really high level, where is DNA found in the body?

24   A.  In most cells of the body.

25   Q.  Is DNA unique to a person?

Ladzia - Cross-Examination

```
 1    A.  Yes.  With the exception of identical twins.

 2    Q.  So we're not identical twins, is my DNA different than

 3    your DNA then?

 4    A.  Yes.

 5    Q.  In the area of forensic, is it possible to distinguish

 6    DNA of one person to another?

 7    A.  Yes.

 8    Q.  How about comparing a sample of DNA from a person you

 9    know to a person where the person is unknown, is it possible

10    to know if the same person provided that DNA sample?

11    A.  Yes.

12    Q.  Can DNA get deposited onto objects?

13    A.  Yes.

14    Q.  Is it possible to retrieve DNA that has been deposited

15    onto objects?

16    A.  Yes.

17    Q.  And, generally, how does DNA from a person get deposited

18    onto a physical object?

19    A.  DNA can get onto -- can be deposited onto objects either

20    through touch or from a bodily fluid.

21    Q.  So just to illustrate, if I touch this pen or an object,

22    is my DNA likely to be deposited onto that object?

23    A.  Yes.

24    Q.  What are some of the factors that would make it more or

25    less likely that a person's DNA would be on an object that
```

 1   the person handles?

 2   A.  One factor could be the texture of the item.  Smooth

 3   objects are less regularly -- excuse me -- textured items

 4   hold DNA more readily than smooth objects.

 5   Q.  Okay.  Let's talk about DNA testing now.  First, how

 6   many parts of a strand of DNA does DNA analysis focus on in

 7   terms of a number?

 8   A.  At the BCA, we look at 21 different locations in the DNA

 9   strand.

10   Q.  And can the amount of DNA be amplified by scientific

11   instruments?

12   A.  Yes.

13   Q.  Can you tell the jury very generally speaking what is

14   involved in DNA testing and developing and comparing a DNA

15   profile?

16   A.  There are forming steps to the DNA analysis process.

17   The first is called extraction in which the DNA is separated

18   from the evidence or the items.  Second is called

19   quantitation in which the amount of DNA is determined.

20   Third is amplification in which millions of copies of DNA

21   are produced.  And, fourth, the DNA is separated out to

22   generate the DNA profile that I will then view on a computer

23   program.

24   Q.  And what is involved in comparing one DNA profile to

25   another?

1    A.  I will look to see what DNA types are present in the

2    different items and see if there are similar types in the

3    different items.

4    Q.  Can you explain the idea of major contributors and minor

5    contributors of DNA?

6    A.  A major contributor is found in a mixture, which is when

7    there is more than one person contributing to that item.

8    The major contributor is contributing more DNA than other

9    people, and the minor contributors are those that are

10   contributing less.

11   Q.  And can you just explain for the jury what is it when

12   you say a mixture, can you explain that a little more for

13   the jurors?

14   A.  Yes.  A mixture is when there is more than one person

15   contributing DNA to that item.

16   Q.  How common is it based on your training and experience

17   to obtain a mixture of DNA on an item such as a firearm?

18   A.  I see it fairly often.

19   Q.  What does it mean when your forensic testing determines

20   that you have a match between DNA profiles?

21   A.  It means that there is the same DNA types found in both

22   items.

23   Q.  Okay.  Let's talk now about the BCA lab briefly.  Is the

24   BCA lab nationally accredited?

25   A.  Yes.

Simon - Cross Examination

```
 1    Q.  What does that mean?

 2    A.  Accreditation is when an organization comes to our lab

 3    to make sure that we are following standards that are set

 4    for us.

 5    Q.  Does the lab comply with all industry standards?

 6    A.  Yes.

 7    Q.  Let's turn now to the case at hand, Ms. Simon.  Did you

 8    perform DNA testing in the case involving Derrick Scott?

 9    A.  Yes.

10    Q.  On what items of evidence pertaining to this case did

11    you perform DNA testing?

12    A.  I did DNA testing on swabs from a pistol as well as a

13    magazine and life cartridges; also, on a known sample from

14    Derrick Scott; and a known sample from Mikita Jackson.

15    Q.  Were these items all properly sealed and in tact when

16    you began your analysis?

17    A.  Yes.

18    Q.  Ms. Simon, I'm now going to show you what's been

19    admitted into evidence as Government's Exhibits 15, 16 and

20    17.  Starting with Government Exhibit 15.  Do you recognize

21    this document?

22    A.  Yes.

23    Q.  And what is this document?

24    A.  This is the envelope that the known sample from Derrick

25    Scott was sent to the lab in.
```

Simon - Direct Examination

1    Q.  I'm going to show you Government Exhibit 16.  What is

2    this document?

3    A.  This is an envelope that the known sample from Mikita

4    Jackson was sent to the lab.

5    Q.  And, finally, showing you Government Exhibit 17, what is

6    this showing us?

7    A.  This is the envelope that the evidentiary items were

8    sent to us in.

9    Q.  Now, Ms. Simon, I'm going to show you what's been marked

10   for identification but not yet admitted into evidence as

11   Government Exhibit 18.  Now, this is a two page document.

12   I'm going to show you the first page and the second page

13   here.

14            THE COURT:  Don't show it until it's been

15   admitted.

16            MS. WALCKER:  I'm going to show this only to you.

17            Your Honor, may I show Government Exhibit 18 to

18   the witness and not for publication yet?

19            THE COURT:  Yes.

20            MS. WALCKER:  Okay, thank you.

21   Q.  Ms. Simon, do you recognize this document?

22   A.  Yes, I do.

23   Q.  And is this a document of your analysis of the DNA in

24   this case?

25   A.  Yes.

1          MS. WALCKER:  Your Honor, I would offer Government
2     Exhibit 18 into evidence at this time.
3          MR. DEVORE:  No objection, Your Honor.
4          THE COURT:  18 is received.  And you may now
5     publish.
6          MS. WALCKER: Thank you, Your Honor.
7     BY MS. WALCKER:
8     Q.  Ms. Simon, can you please walk us through what this
9     chart shows us?
10         THE COURT:  Members of the jury, publish in our
11    words means "show".  It doesn't mean go get a publishing
12    company and write a book.
13         MS. WALCKER:  Thank you, Your Honor.
14    BY MS. WALCKER:
15    Q.  Ms. Simon, can you tell us what this chart we're seeing
16    shows?
17    A.  This shows the different DNA types that were found on
18    each of the items that were analyzed.
19    Q.  And under the DNA summary heading there, do you see that
20    before you?
21    A.  Yes.
22    Q.  Can you walk us through the sample name column here?
23    I'll make this a little bit bigger so we're not straining
24    our eyes.
25    A.  The top row of the DNA types found on the magazine and

Kadkhoda - Direct Examination

```
 1    live cartridges.  The second row are the DNA types found on

 2    the pistol and switch.  The third row, the green row, is the

 3    DNA types that were found from Mikita Jackson's known

 4    sample, and the bottom blue row are the DNA types found from

 5    Derrick Scott's known sample.

 6    Q.  And we talked earlier about it to the number of items in

 7    a DNA strand.  Is this when you use your work product in

 8    comparing the DNA on those items in this case?

 9    A.  Yes.

10    Q.  Did you make any conclusions and findings after doing

11    the DNA testing in this case?

12    A.  Yes.

13    Q.  What were those findings with respect to the gun and

14    magazine we just discussed?

15    A.  May I refer to my report?

16    Q.  Oh, yes.

17              MS. WALCKER:  Your Honor, may the witness review

18    her report to refresh her recollection?

19              THE COURT:  Yes.

20              MS. WALCKER:  Thank you.

21              THE WITNESS:  For which item?

22    BY MS. WALCKER:

23    Q.  Start with the gun.

24    A.  The pistol and switch was a mixture of three or more

25    individuals.  The major male DNA profile matches Derrick
```

1    Maurice Scott.

2              MR. DEVORE:  Your Honor, objection.  I believe the

3    witness is reading from the report.  I prefer that she

4    refresh her recollection and testify as to what she knows.

5              THE WITNESS:  I apologize.

6              THE COURT:  Let me rule on the objection first.

7    Would you clarify your question?

8              MS. WALCKER:  Yes, thank you, Your Honor.

9    BY MS. WALCKER:

10   Q.  Ms. Simon, once you have an opportunity to refresh your

11   recollection, I'm going to ask you a couple of questions.

12   Okay?

13   A.  Okay.

14   Q.  And if you could review that and let me know when you're

15   ready?

16   A.  Yes.

17   Q.  Ms. Simon, what were your findings and conclusions with

18   respect to the gun in this case?

19   A.  It was a mixture of three or more individuals.  The

20   major male DNA profile matched Derrick Scott and did not

21   match Mikita Jackson.

22   Q.  What does it mean that the major male DNA profile

23   matches Derrick Scott?

24   A.  When I looked at the DNA types found on the items, the

25   DNA types from Derrick Scott were found in the major profile

1    of the gun.

2    Q.  And what does it mean that the DNA profile, the major

3    contributor did not match the DNA profile of Mikita Jackson?

4    A.  That means that her DNA types were not found in the

5    major profile.

6    Q.  And with respect to the magazine, what were your

7    findings and conclusions?

8    A.  It was a mixture of four or more individuals.  The major

9    DNA profile matched Derrick Scott and did not match Mikita

10    Jackson.

11    Q.  And how strong of a correlation was that DNA match for

12    Derrick Scott?

13    A.  It would not be expected to occur more than once among

14    unrelated individuals in the world population.

15    Q.  You said, "more than once among unrelated individuals in

16    the world population"?

17    A.  Correct.

18    Q.  Is that a strong correlation?

19    A.  Yes.

20    Q.  Is there any stronger correlation?

21    A.  Not that we use, no.

22             MS. WALCKER:  Your Honor, may I confer with my

23    co-counsel?

24             THE COURT:  Yes.

25             MS. WALCKER:  Thank you, Your Honor.

Simon - Cross Examination - DeVore

```
 1              MS. WALCKER:  Thank you, Ms. Simon.  I have no
 2    further questions.  Thank you, Your Honor.
 3              THE COURT:  Mr. DeVore?
 4
 5                      CROSS EXAMINATION
 6    BY MR. DEVORE:
 7    Q.  Good morning.
 8    A.  Good morning.
 9    Q.  Ms. Simon, did you pull the swabs off the gun yourself
10    or was that done by somebody else?
11    A.  That was done by someone else.
12    Q.  Did you ever actually physically see the gun in your
13    possession?
14    A.  No.
15    Q.  Do you know what parts of the gun were actually swabbed?
16    A.  Not specifically, no.
17              MR. DEVORE:  That's all I have, Your Honor.
18    Thank you.
19              THE COURT:  Anything else, Ms. Walcker?
20              MS. WALCKER:  No, Your Honor.  Thank you.
21              THE COURT:  Ms. Simon, thank you.  You may step
22    down.
23              MR. HOLLENHORST:  The government calls Denis
24    Otterness.
25                      DENIS OTTERNESS,
```

```
 1                  After having been first duly sworn, testified upon
 2       the oath, as follows:
 3                  THE COURT:  Take the witness stand.
 4
 5                         DIRECT EXAMINATION
 6       BY MR. HOLLENHORST:
 7       Q.  Please state your full name.
 8       A.  Dennis Otterness, O-T-T-E-R-N-E-S-S.  First name is
 9       Denis, with one S.
10       Q.  Where do you work, Mr. Otterness?
11       A.  I'm currently employed as the Chief of Police for the
12       West Fargo North Dakota Police Department.
13       Q.  You don't do that every day of the week though, do you?
14       A.  Serve as the chief?
15       Q.  No, I guess what I'm alluding to your face is very red,
16       and I think you've been somewhere else recently.
17       A.  Yes, thank you.  I did get a chance to thaw out in
18       Arizona and play a little golf the last few days, so other
19       than that.
20       Q.  All right.  So as Chief of Police though, what are your
21       duties up there?
22       A.  So I oversee a department of 75 sworn officers and about
23       15 civilians with some volunteers, and just every day
24       management and oversight of the entire department, all four
25       divisions that we have, and then we have a number of people
```

Enderle - Direct Examination

1   that are assigned to different task force operations in the

2   Fargo, Moorhead, West Fargo and metro area.

3   Q.  Let me be clear about one thing, you have nothing to do

4   with this case other than testifying here about certain

5   behaviors of drug traffickers; is that right?

6   A.  That's correct.

7   Q.  But you have reviewed some of the evidence in this case;

8   is that right?

9   A.  Yes, I have.

10  Q.  How long have you been a police officer?

11  A.  32 years.

12  Q.  What are some of the other assignments you've had in

13  connection with your duties?

14  A.  So I spent a majority of my career in the Minneapolis

15  metropolitan area here with the Bloomington, Minnesota,

16  Police Department.  I served a short time in the patrol

17  division there.  I was assigned to the Special

18  Investigations Unit, and we focussed primarily on narcotics

19  and human trafficking cases, some felony fugitive

20  apprehensions.  And from that unit, I was loaned out to the

21  Drug Enforcement Administration here in Minneapolis and

22  served as a task force officer for a number of years

23  investigating federal level narcotics cases.

24  Q.  What education have you had?

25  A.  I'm a graduate of North Dakota State University.  I have

Edwards - Direct Examination

1    a bachelor's degree from there, and I received a Master's

2    degree in Law Enforcement Leadership and Public Safety from

3    the University of Saint Thomas here in St. Paul.

4    Q.  Have you ever gotten any specialized training in drug

5    trafficking and weapons possessions?

6    A.  I have.  A number of years numerous courses through both

7    the U. S. Attorney's Office, the Department of Justice here

8    in Minnesota, more locally, with the Bureau of Apprehension,

9    lots of different trainings on techniques and trafficking

10   and firearms, asset forfeiture, money laundering cases, and

11   things like that.

12   Q.  Have you ever given any training?

13   A.  Yes, I have.

14   Q.  Can you please describe?

15   A.  Sure.  I've done a number of trainings at my own

16   department related to narcotics trafficking.  I've been a

17   training officer for a number of people that came through

18   our narcotics unit in Bloomington, in addition to training

19   some federal agents while I was assigned at the DEA as one

20   of the more senior task force officers there.

21   Q.  Have you conducted your own investigations into drug

22   trafficking and weapons possession?

23   A.  Yes, I have.

24   Q.  How many investigations would you estimate you worked

25   on?

Edwards - Robinson - Direct Examination

1    A.  Over the specifically as a case agent or a co-case agent

2    or assisting from the group, the enforcement group I was in,

3    it would range in the hundreds.  I served in that capacity

4    for approximately 12 years, so several hundred cases.

5    Q.  Have you testified as an expert before in the area of

6    your expertise?

7    A.  Yes, I have.

8    Q.  And I want to clear another thing up right away.  Are

9    you being paid any special fees for your testimony here

10   today?

11   A.  No, I'm not.

12   Q.  Have you been told to testify one way or another?

13   A.  No.

14   Q.  Is your testimony going to be based on your own

15   experience and training and nothing that anyone has

16   suggested to you?

17   A.  Yes, it is.

18   Q.  Okay.  So let's start off with a general question.  This

19   case involves money, or excuse me, this case involves drugs

20   and guns.  Is there any special connection between guns and

21   drugs?

22   A.  There is.  Based on my experience, certainly in my

23   training and the number of cases I've worked, guns and drugs

24   typically go hand in hand, and the reason is trafficking in

25   narcotics is a very dangerous business.  It's an all cash

Edwards - Cross Examination

1   business, and it's done usually covertly, and so there is

2   the propensity for violence associated with that either

3   through robberies of cash or product, and so most cases that

4   I've investigated in terms of drug trafficking had a

5   firearms component as well.

6   Q.  Why would anyone who is peddling drugs have a gun then?

7   A.  Well, as I stated, sometimes it's for protection either,

8   again, product that is very valuable, U.S. currency, which

9   is the primary trade in drug trafficking, and also for

10  personal protection.  You know, again, there's a fair amount

11  of violence that's associated with drug trafficking.

12  Robberies happen quite frequently and usually because people

13  may be involved in something that's illegal, they're not

14  able to contact the police department for assistance, so a

15  lot of times people will take matters into their own hands.

16  Q.  Would you say that firearms are more common or less

17  common when a drug trafficker is operating in a high crime

18  area?

19  A.  More common.

20  Q.  Why is that?

21  A.  Again, it's the protection factor.  If it's a high crime

22  area, there's a propensity for violence any way in that

23  area, but then if you factor in the trafficking and, again,

24  the large volumes of currency that go along with that and

25  the value of the product that somebody might be selling,

1    they have to protect their interest.

2    Q.  Is there anything significant about a gun being found in

3    close proximity to drugs?

4    A.  In terms of significance, I guess it's not uncommon.

5    Oftentimes, again, most of the cases that I worked on that

6    involve traffickers or trafficking of narcotics, there was

7    generally firearms present.

8    Q.  Would the presence of a gun lead to a conclusion one way

9    or another as to whether or not the drugs found near the gun

10   are for distribution or for personal possession?

11   A.  I guess it would depend on the quantity but certainly

12   traffickers rather than users typically possess firearms

13   because, again, there's going to be larger quantities of

14   product rather than user quantities, so it may either be

15   that they have a large sum of U.S. currency in their

16   possession from the sale or proceeds of those drugs or they

17   are going to have the product on hand and both are very

18   valuable in terms of drug trafficking.

19   Q.  You've talked about money associated with drug

20   trafficking, is that why people sell drugs?

21   A.  It is, for profit.

22   Q.  Do you always find money in close proximity to drugs

23   during seizures?

24   A.  No.

25   Q.  Why is that?

Dockins - Direct Examination

1    A.  Well, it depends.  Generally speaking, in my experience,

2    traffickers don't often times carry their entire stash of

3    money along with their product because if they be contacted

4    by law enforcement, that money then becomes subject to asset

5    forfeiture or seizure.  So it could be that they just got

6    started trafficking or selling for the day, and they don't

7    have any cash.

8              I've also seen traffickers that will go out and

9    make sales and drop money off at a stash location where they

10   keep money.  They don't oftentimes keep their money and

11   their drugs in the same location.  Again, because if they

12   get detected by law enforcement then it's subject to

13   forfeiture.

14   Q.  Is there any significance to the time of day when drug

15   traffickers deal drugs?

16   A.  I would say generally based on the cases that I worked,

17   it was usually late mornings into the, you know, late

18   evenings, not very typical to be early morning.  You know,

19   the 8:00 a.m. start time or 9:00 a.m., it generally speaking

20   was after lunch and into the afternoon and evening hours.

21   Q.  If a person is starting off on drug-runs say in the

22   mid-afternoon and is found with drugs but not cash, would

23   that be unusual?

24   A.  No.

25   Q.  Why not?

1    A.  Well, again, if you're just getting going for the day,

2    making some deliveries, it would not be unusual at all to

3    not have any currency.  Again, depending on, you know, who

4    it is or where they're staying, they're not generally going

5    to travel with all of their proceeds and all of their

6    product at the same time because if you lose both, you know,

7    you've lost not only your proceeds from the sale of the

8    drugs but you've also lost your product.

9    Q.  We've talked about firearms that drug traffickers carry.

10   What kind of firearms do they typically carry?

11   A.  Typically, something that could be concealed a handgun.

12   Q.  Okay.  Are you familiar with the Glock?

13   A.  I am.

14   Q.  Is that a common firearm that's found on the street?

15   A.  Yes, it is.

16   Q.  How much does a Glock on the street sell for typically?

17   A.  Well, I would say there's probably a range.  It depends

18   how quickly somebody is trying to get rid of one.  If it was

19   used in a crime, you might be able to sell that gun quickly

20   for not as much.  If it's a high capacity sought after

21   firearm like a Glock, generally it sometimes can go for

22   twice the retail price, if it's what we would refer to as a

23   clean gun or one that hasn't been used in a crime before;

24   but so really there's a range but, generally, they don't

25   sell for retail price.  I would say it's generally more than

Edwards - Cross Examination

1   that.

2   Q.  Can you give us a general range of prices then for --

3   you're familiar with the firearm that was seized in this

4   case?

5   A.  Yes, I am.

6   Q.  For that firearm, what would you say?

7   A.  Well, I would say the retail price is probably somewhere

8   in the $400 range, so, again, if it was a gun that wasn't a

9   clean gun or used in a commission of a crime, it may sell

10  for a little bit less.  You know, that 250 to $300 range.

11  If it's a gun that nobody has used in the commission of a

12  crime, it could sell for $800 or they may trade drug

13  products for a firearm.  I've seen that happen.

14  Q.  Have you ever come across the term "switch"?

15  A.  I have.

16  Q.  What is a switch?

17  A.  A switch is an after-market modification to a firearm

18  that basically converts it from a semi-automatic or a

19  firearm that shoots one round every time you pull the

20  trigger.  It converts it to a fully automatic firearm, so

21  you only have to pull the trigger once and it will fire

22  multiple rounds, basically, until you either let off the

23  trigger or you run out of ammunition.

24  Q.  Are firearms equipped with a switch more or less

25  expensive on the street?

1    A.  They would be more expensive.

2    Q.  Why is that?

3    A.  Because they are fully automatic.  Some of it is, in the

4    drug trade, it's a status issue to be able to have a fully

5    automatic handgun on the street, and it's also something

6    that obviously is very powerful.  You can put a lot of

7    rounds down range with a single pull of a trigger.

8    Q.  Based on your experience and training, have you found

9    that drug traffickers and people who possess weapons are

10   generally familiar with the characteristics of those

11   weapons?

12   A.  Yes.

13   Q.  How so?

14   A.  Well, they would have to know how they function, and so

15   if somebody was carrying a handgun with a switch, it would

16   be they're mounted on the back of the slide of a handgun, so

17   it would be very obvious that it's an after market piece

18   that was put on that firearm for a very specific purpose, to

19   convert that gun again from a semi-automatic handgun to

20   something that is fully automatic.

21   Q.  How common are these switches?

22   A.  They're becoming a lot more common.  I would say

23   10 years ago very uncommon, but today in today's world with

24   drug trafficking, they are much more common now.

25   Q.  Are you familiar with the terms that drug traffickers

Edwards - Direct Examination

1    use in describing a weapon equipped with a switch?  Do they

2    call it anything?

3    A.  I guess I wouldn't be able to testify to a specific

4    terminology.

5    Q.  Okay.  Is the term "switch" sometimes used to describe

6    both the little gizmo on the back and also the firearm

7    itself?

8    A.  Yes, yes.

9    Q.  So if one were to say, "I'm going to get me a switch,"

10   it could refer to a firearm with a switch?

11   A.  Yes.

12   Q.  Do you know what a magazine is other than one you read?

13   A.  I do.  For --

14   Q.  For firearms?

15   A.  For firearms terms, it's the magazine holds the

16   ammunition that gets inserted into the handle of the gun.

17   Q.  Have you examined the magazine that was seized in

18   connection with this case?

19   A.  Yes, I have.

20   Q.  Is there anything unusual about it?

21   A.  Well, it's a large capacity magazine.  It's not one

22   that's typically sold with that firearm.  It's an extended

23   magazine that carries 24 rounds, which is a high capacity

24   magazine as opposed to what would normally come with that

25   weapon.

```
 1    Q.  Is there any correlation between a person possessing a

 2    firearm equipped with a switch and a high capacity magazine?

 3    A.  Yes.

 4    Q.  What is that correlation?

 5    A.  Well, again, as I previously mentioned, being able to

 6    have the additional rounds and fire power to be able to

 7    again with a single pull of a trigger send a lot of rounds

 8    down range and in a very short period of time, so they are

 9    very dangerous.

10    Q.  Let's talk about fentanyl, do you know what fentanyl is?

11    A.  I do.

12    Q.  What is it?

13    A.  It is a synthetic opioid.  It's an analgesic, so it's

14    medical purpose is to relieve pain.

15    Q.  And it was created for that purpose, is that your

16    understanding?

17    A.  It was.

18    Q.  Did it eventually evolve into becoming a drug of abuse?

19    A.  It has.  It's become very prolific over the last

20    probably five to seven years.  Fentanyl has become very

21    dangerous for all of our communities.  It is very potent.

22    It's very lethal.  And, unfortunately, today you see

23    fentanyl being cut into almost every type of controlled

24    substance that's sold illegally in the United States.

25    Q.  And when you use the term "cut", you mean mixed in with?
```

Edwin Guzman - Direct Examination

1    A.  That's correct.

2    Q.  Where does fentanyl come from?  The abusing fentanyl,

3    the drug of abuse, where does that fentanyl come from?

4    A.  Well, it's manufactured.  It's man-made.  It's

5    synthetic, and so a lot of the precursor chemicals that get

6    utilized to manufacture fentanyl come from overseas in

7    China, but a majority of the fentanyl that is coming into

8    the United States either in the form of counterfeit pills or

9    laced into heroin, cocaine, methamphetamine, a majority of

10   that is coming into our southwest border from Mexico.

11   Q.  How is this fentanyl typically packaged?

12   A.  Well, it gets sold illegally on the street either in

13   powder form or it gets again cut into or laced into cocaine

14   that's being trafficked into the United States from Mexico,

15   methamphetamine, and the more dangerous piece of that now

16   for us in law enforcement is the counterfeit pills that are

17   being pressed or manufactured in Mexico and brought into the

18   U.S.  Those are getting pressed into -- that fentanyl is

19   being added into a pill that mimics or is a counterfeit

20   look-alike to something that you could actually purchase in

21   a pharmacy with a doctor's prescription.

22   Q.  Are you familiar with the term "M30 pill" or "M Box 30

23   tablet"?

24   A.  Yes, that's exactly what I was describing just in my

25   testimony.  Those are the counterfeit pills that are very

1    prolific in the communities right now.

2    Q.  So if I understand your testimony that there are these

3    M-30 pills that are legitimately sold, do they contain other

4    drugs, legitimate drugs; is that right?

5    A.  That's correct.  It would be manufactured by a

6    pharmaceutical manufacturer that you could, if you were

7    experiencing pain and a doctor prescribed, you know, you

8    have a prescription for a pain killer, you can go into a

9    pharmacy and get a prescription drug that looks almost

10   identical to the ones that are being sold now illegally on

11   the street.

12   Q.  But those prescription drugs don't contain fentanyl,

13   right?

14   A.  That's correct.

15   Q.  So why would a drug trafficker want to disguise or mimic

16   a pill that doesn't contain fentanyl?  Why would someone

17   want to do that?

18   A.  Well, it's much more profitable to have a counterfeit

19   M-30 pill with fentanyl.  It sometimes, I guess, defies

20   logic.  But from the user's perspective, they, typically, if

21   you were going to sit down and talk to a user, they would

22   tell you that they are trying to chase that same high that

23   they got the first time they used a controlled substance.

24   So the demand for fentanyl-laced either heroin or the M30

25   pills is sky rocketing, and so rather than use heroin that's

1    not cut or an M30 pill that is coming as a prescription from

2    a pharmaceutical company, most of the users are demanding

3    that they be able to purchase fentanyl laced narcotics now.

4    So it's supply and demand, and the demand is coming on the

5    user end.

6    Q.  Have these counterfeit M30 pills become more common over

7    the last couple of years?

8    A.  Very much so.

9    Q.  Did you even see them five or six years ago?

10   A.  No.

11   Q.  So how potent is fentanyl?  Can you give an example?

12   A.  It's very potent.  It's causing a number of overdoses

13   throughout our communities, and I believe, according to the

14   Drug Enforcement Administration and other chemists and labs,

15   two milligrams of fentanyl, which is basically like a couple

16   of salt crystals that you might pour out of your salt shaker

17   is enough to cause an overdose.

18   Q.  And that's pure fentanyl?

19   A.  That's pure fentanyl, yes.

20   Q.  What is the typical price of one of these M30 pills on

21   the street?

22   A.  Well, it really depends on the quantities of drugs that

23   you traffic.  If you're somebody that buys in real bulk

24   quantities, you get them a lot cheaper, and so you might be

25   able to sell them a little bit more less expensive, so they

Bruns - Direct Examination

1   would range in an area like Minneapolis, St. Paul, that is a

2   hub or distribution point for a lot of different communities

3   both in, you know, the surrounding states, I mean you might

4   be able to get them anywhere from $10 to $25 a pill.

5            If you go out to where I'm located now in West

6   Fargo, obviously, the transportation of the drugs getting to

7   North Dakota, somebody is taking the risk of transporting

8   that to another state, so the price is going to increase.

9   So I've seen those pills run from 40 to $50, typically, in

10  North Dakota to as high as $80 in Indian country or on the

11  reservations.

12  Q.  Are you familiar with the North Minneapolis area of the

13  Twin Cities?

14  A.  Yes, very much so.

15  Q.  And how would you describe it as far as law enforcement

16  is concerned?

17  A.  Well, there are certain pockets in that area that I

18  would describe as high crime areas.

19  Q.  So in those high crime areas then these pills would sell

20  for anywhere from 10 to $25?

21  A.  Yes.

22  Q.  Now, if you had a bag of 355 pills, what would that

23  street value be then?

24  A.  Well, without a calculator, I, you know, at $10, it

25  would be $3,500, but, again, in price if it goes up, it

Direct Examination

 1    would be significantly more.

 2    Q.  Have you found it typical for drug users to have

 3    quantities in that amount?

 4    A.  Users, no.  Distributors, yes.

 5    Q.  Can you explain that a little more?

 6    A.  Sure.  Your typical user is going to maybe have a pill

 7    or two in their possession.  They don't typically buy in

 8    those kind of quantities.  They generally don't have the

 9    ability to do that, and so they will buy as they can afford

10    it, but traffickers, people that are involved in the

11    distribution would certainly have those types of quantities

12    to go out for a day to distribute.

13    Q.  If law enforcement were to find a bag of fentanyl pills,

14    say 355 of them, and they were contained in one big bag and

15    then two smaller bags, one with say roughly 340 pills, one

16    with roughly 15 pills, what, if anything, would that tell

17    you?

18    A.  Well, based on the cases that I've worked, I would say

19    that they were probably pre-packaged for distribution.  That

20    smaller quantity was probably intended for somebody, so when

21    that sale is going to happen, whoever is trafficking in that

22    quantity would already have that packaged up so they don't

23    have to sit and count out, you know, I believe you said 15

24    pills or 16 pills, and so it's probably already pre-packaged

25    for distribution.

1   Q.  And what distributable amounts do drug traffickers at

2   the level of say 355 tablets, what -- how do you they

3   normally distribute those drugs and in what quantities?

4   That was a long-winded question.

5   A.  Again, it would depend if you're selling to maybe a

6   mid-level dealer that's going to parse them out by pill or

7   whether you're selling just to a user and sell them a pill

8   or two at a time, but, generally speaking, you know, they're

9   sold, the user quantity that we find specifically in the M30

10  pills is, you know, one or two pills.

11  Q.  Would a quantity of 16 pills be more indicative of a

12  sale to a lower level drug distributor himself?

13  A.  Yes.

14  Q.  Are you familiar with the term "bindle"?

15  A.  I am.

16  Q.  What is a bindle?

17  A.  Typically, in the drug world, a bindle refers to just a

18  little plastic bindle, I guess, that normally you see

19  powder-controlled substances distributed, so they will take

20  like a sandwich baggy and put the drugs down in the corner

21  and kind of twist it and then tear it off and that will

22  create a bindle and so it might get sold in gram quantities.

23  It might get sold in what's referred to an eight ball

24  quantity or something similar, but, normally, the bindles

25  are, again, have the powder types of controlled substances

1     like cocaine, heroin, powder heroin, methamphetamine, things

2     like that, not the M30 pills wouldn't get then twisted off

3     into a bindle.  It would just get sold as a pill.

4     Q.  Okay.  And these bindles can range in quantities of

5     what?  Have you seen them as low as .1 gram, .2 grams?

6     A.  Sure, depending on what type of narcotic --

7                MR. DEVORE:  Your Honor, objection on leading.

8                THE COURT:  Overruled.

9                THE WITNESS:  I would say again not based on what

10    kind of narcotic it is.  If you're trafficking in heroin,

11    typically, that is so powerful and potent you might see a

12    lot smaller quantity.  The user quantities for heroin is a

13    lot smaller than you might see for cocaine or crack cocaine

14    or methamphetamine.  So, again, it's really going to vary

15    based on what type of controlled substances we're talking

16    about.

17    BY MR. HOLLENHORST:

18    Q.  If you were to examine a case in which a person was

19    arrested with 62 bindles mixed with cocaine and then a

20    fentanyl-laced heroin in a quantities of .1 to .2 grams,

21    what would you conclude as to whether or not that person was

22    a drug distributor or a drug user?

23    A.  Absolutely trafficking.  Those are pre-packaged little

24    bindles for distribution.

25    Q.  Is the same true with 355 tablets of fentanyl?

Edwards - Direct Examination

1    A.  Yes.

2    Q.  So I'm just going to finish up with a couple of

3    questions.  You're familiar with the term "stash" or "hide"

4    or "safe place" or whatever?

5    A.  Yes.

6    Q.  What are we talking about there?

7    A.  Well, a stash or a hide, you could be referring to

8    either a residence, a stash house, where, again, I think I

9    mentioned briefly earlier you might have a place where

10   you're stashing your drugs that you're distributing.  You

11   might have a separate place where you're stashing your

12   money, typically, not together.  Or you could be talking

13   about a vehicle that's got an after market or natural void

14   that gets used for to hide or conceal oftentimes drugs,

15   firearms, cash, things like that.

16   Q.  And why would a drug trafficker use a hide or a stash in

17   a car?

18   A.  Well, to thwart detention by law enforcement or anybody

19   that might be trying to rob them potentially, but, generally

20   speaking, to thwart detection by law enforcement, to keep it

21   out of view, make it more difficult for law enforcement to

22   locate that if they're out conducting a routine traffic

23   enforcement or something similar.

24   Q.  Would you say that these stashes or hides are typically

25   readily available to drug traffickers?

Edwards - Direct Examination

1     A.  Yes.

2     Q.  In other words, they can be accessed within a few

3     seconds?

4     A.  Yes.

5     Q.  Finally, do drug traffickers always operate alone?

6     A.  No.

7     Q.  Okay.  Could you explain some examples of how drug

8     traffickers use other people in their drug trafficking

9     activities?

10    A.  Sure.  A lot of times, well, sometimes they do operate

11    alone.  I guess based on my experience and a lot of the

12    cases that I was involved in, you might have a trafficker

13    that might be utilizing somebody to maintain a stash house.

14    They might store their drugs or firearms or currency

15    somewhere, and so they might have people rent different

16    locations, buy different locations and utilize those.

17         I've also seen people utilize folks to drive them

18    to traffic in narcotics, especially if they don't have a

19    valid driver's license.  They're probably going to look for

20    somebody that can drive them around to conduct their illegal

21    activities and not have to worry about being stopped by law

22    enforcement and being arrested for a driving violation or

23    license violation and then having law enforcement find their

24    drugs or proceeds from sales, things like that.

25         So, generally, when we found people that are

Otterness - Cross Examination

1    driving people or working in that capacity or that role,

2    it's somebody that they know that has a valid driver's

3    license that's getting them around.

4              MR. HOLLENHORST:  I have no further questions,

5    Your Honor.

6              THE COURT:  Very well.  Mr. DeVore?

7                      **CROSS EXAMINATION**

8    BY MR. DEVORE:

9    Q.  Good morning.

10   A.  Good morning.

11   Q.  Mr. Otterness, how long have you been up at North

12   Dakota?

13   A.  I've been Chief of Police there for approximately

14   two-and-a-half years.

15   Q.  You said you've worked many, many cases involving guns

16   and drugs in your 32-year career, correct?

17   A.  Yes, sir.

18   Q.  I just want to cover a couple of things.  Have you ever

19   had cases where people are selling drugs and did not have a

20   gun?

21   A.  Yes.

22   Q.  And vice versa, have you ever had cases where somebody

23   had a gun that you've been involved in in a case that were

24   not selling drugs?

25   A.  I suppose, yeah, I would have to say yes, if it was a

Edwards - Cross-Examination

1  different type of investigation, certainly, we've stopped

2  people with firearms and not that they possessed legally and

3  illegally.

4  Q.  Sure.  And sometimes people have guns for things like

5  protection; is that fair to say?

6  A.  Yes.

7  Q.  And that could even be more true in areas of high crime

8  like North Minneapolis; would you say that's true as well?

9  A.  Well, I guess if you're talking whether somebody

10  possesses it legally or illegally, it would vary, but I

11  would say that, generally speaking, law abiding people that

12  may have a permit to carry one, certainly, and then people

13  that are involved in criminal activity, again, as we talked

14  about today might have more of a need to protect themselves

15  if they're involved in a drug trade or something similar.

16  Q.  Or just somebody illegally or legally that just might

17  have a gun for protection versus for selling drugs; isn't

18  that true?

19  A.  Yes.

20          MR. DEVORE:  That's all I have, Your Honor.

21  Thank you.

22          THE COURT:  All right.  Mr. Hollenhorst, anything

23  else?

24          MR. HOLLENHORST:  No further questions, Your

25  Honor.

 1            THE COURT:  All right.  Chief Otterness, you may

 2     step down.  Thank you.

 3            THE WITNESS:  Thank you, Your Honor.

 4            THE COURT:  Mr. Hollenhorst?

 5            MR. HOLLENHORST:  Your Honor, the only thing we

 6     would like to confer with your clerk to make sure that we

 7     have all of our exhibits admitted.

 8            THE COURT:  All right.  So this is some

 9     housekeeping.

10            Members of the jury, I will ask you to step out

11     because this is going to be kind of we're going to go

12     through lists and compare, so you might as well go back to

13     the deliberation room, and we'll have you back when we're

14     finished with this.  Thank you very much.

15            All rise for the jury.

16                 (Jury out at 8:58 a.m.)

17

18         IN OPEN COURT WITHOUT JURY PRESENT

19            THE COURT:  Okay.  24A and B are in, if you were

20     wondering.

21            MR. DEVORE:  Okay.

22            THE COURT:  Mr. DeVore, have you got your list?

23            I have everything in in the government's witness

24     list except 5A and 5B.  I guess that's it.  So I have

25     everything else on that list as in, and I don't have any

1    additional items that are in.

2             MR. DEVORE:  Okay.

3             MR. HOLLENHORST:  Okay.  Then we are ready when

4    the Court is ready to accept the exhibits.

5             THE COURT:  Okay, but before we do that.  So is

6    the next thing that happens is the government is going to

7    rest?

8             MR. HOLLENHORST:  Yes, Your Honor.

9             THE COURT:  Okay.  And then we might as well take

10   this opportunity to make sure that Mr. Scott understands his

11   right to testify or not testify.

12            Mr. DeVore, will you be calling any witnesses

13   other -- we'll set Mr. Scott aside.  Will you be calling any

14   any witnesses?

15            MR. DEVORE:  No, Your Honor.

16            THE COURT:  Or presenting any evidence?  Okay.

17            MR. DEVORE:  No, Your Honor.

18            THE COURT:  Mr. Scott, will you come up to the

19   podium please.  You can bring your lawyer with you.

20            You have the chance to testify in front of the

21   jury if you want to do that.  Do you understand that you

22   have that right?

23            THE DEFENDANT:  I do.

24            THE COURT:  And you also have the right to not

25   testify.  And do you understand that you have that absolute

1    right?

2                  THE DEFENDANT:  Yes, I do.

3                  THE COURT:  If you do not testify, there is an

4    instruction that I can give to the jury that says the

5    defendant, the fact that the defendant has not testified is

6    not something that can be taken into consideration or talked

7    about by you.  Sometimes a defendant will want me to give

8    that instruction, and sometimes they don't want me because

9    they think it just calls attention to the fact.

10                 So on the matter of whether I give that

11   instruction or not, that's something that you can talk to

12   Mr. DeVore about in making your decision.

13                 THE DEFENDANT:  Okay.

14                 THE COURT:  So I'm not going to ask you right now.

15   I just want to make sure that you understand that that's a

16   choice that you have.

17                 THE DEFENDANT:  I understand.

18                 THE COURT:  As to the choice of whether to testify

19   or not, that's not something that your lawyer gets to

20   decide.  That's something that you decide for yourself.  So

21   that's why I'm talking to you individually now because

22   normally if I talk to your lawyer because it's his job to

23   speak for you in court, but on this important point of

24   whether you testify or not, that's a personal decision.

25   Consult, you know, your own self or anybody you want to, but

1    in the end, it's your decision.

2            Now, is that something that you are ready to

3    decide about now or do you need to talk to somebody about

4    that?

5            THE DEFENDANT:  I'm ready to decide now.

6            THE COURT:  Okay.  And --

7            THE DEFENDANT:  I don't want to testify.

8            THE COURT:  You don't want to testify, okay.  All

9    right.  That's good.  And do you and Mr. DeVore know whether

10   you want me to give that instruction on the defendant not

11   testifying?

12           MR. DEVORE:  I would like the instruction, yes.

13           THE COURT:  Okay.  Do you agree with that?

14           THE DEFENDANT:  I agree with it.

15           THE COURT:  Most of the time it's given.  Okay.

16   Thank you.

17           THE DEFENDANT:  Thank you.

18           THE COURT:  We'll have the jury come back in then,

19   and we'll have them come in.  The government will rest.  The

20   defense will rest, and then I will send them on a break.

21   Can we do closings?

22           MR. DEVORE:  I think we can.

23           THE COURT:  Okay.

24           MS. WALCKER:  If I could, Your Honor, before we

25   bring them in have a five minute break to use the rest room?

```
 1                    THE COURT:  No.

 2                    MS. WALCKER:  Thank you, Your Honor.

 3                    THE COURT:  Can you wait until they do their

 4      break?

 5                    MS. WALCKER:  Oh, yes, I wasn't sure if you were

 6      going to --

 7                    THE COURT:  So they're only going to be here for a

 8      second and then I'm going to send them out.  And then I'll

 9      give you a copy.  That's what Cathy brought me was a copy of

10      the instructions, I'm going to give these to you, so it's

11      all good.

12                    MS. WALCKER:  That's perfect, Your Honor.  Thank

13      you.

14                    THE COURT:  Well, perfect is a higher standard

15      than we hold ourselves to.

16                    MR. DEVORE:  We're just getting ready.

17                    THE COURT:  That's fine.

18                    MR. DEVORE:  I've had some judges that on the hour

19      have everybody on the hour take a two-minute standing break.

20                    THE COURT:  You guys are full of ideas about what

21      other judges do.

22                    MR. DEVORE:  We're always learning.

23                    THE COURT:  By "we" you mean you.

24                    MR. DEVORE:  I'm still young.

25                    THE COURT:  Yeah, you're just making it worse,
```

1    Kevin.

2                    (Whereupon, jury is seated.)

3                    IN OPEN COURT WITH JURY PRESENT

4                            (9:07 a.m.)

5            THE COURT:  Please be seated.  Mr. Hollenhorst?

6            MR. HOLLENHORST:  Your Honor, the Government

7    rests.

8            THE COURT:  Very well.  At this time, members of

9    the jury, you've heard all of the government's evidence.

10   Let me ask Mr. DeVore, if there is anything that will be

11   presented on behalf of the defense.

12           MR. DEVORE:  No, Your Honor.  The Defense rests.

13           THE COURT:  Very well.  So at this point you have

14   heard all of the evidence that is going to be admitted in

15   this case.  What remains is for you to hear the closing

16   arguments of the lawyers and to have my final instructions.

17   And so this is a time when I'm going to let you have your

18   actual morning break, so let's give you a 20-minute break.

19   So we'll take a 20-minute break and then resume at 9:30.

20           So I'm going to stay behind and talk to these

21   folks a little bit, so you're now excused for your break.

22   All rise for the jury.

23                    (Jury out).

24           THE COURT:  Please be seated.

25

```
 1              IN OPEN COURT WITHOUT JURY PRESENT
 2         THE COURT:  I've got copies of the instructions
 3    for you and the verdict form.
 4              So I'll leave you with these, and if there's
 5    anything that you want to bring to my attention, just
 6    somebody let me know, but there's no point in us all sitting
 7    here.  And so I'll see you back here at 9:30.  We're in
 8    recess.
 9                  (Short recess at 9:11 a.m.)
10
11                     (9:29 a.m.)
12
13              IN OPEN COURT WITHOUT JURY PRESENT
14         THE COURT:  We are about to bring the jury in, but
15    I just want to put on the record that counsel had no
16    objection to the jury instructions or verdict form.
17         MR. HOLLENHORST:  Correct.
18         THE COURT:  All right.  So now it looks like you
19    need a second for your technology.
20         MR. HOLLENHORST:  Yes, and just one tiny matter.
21    First of all, we checked with the court reporter.  We did
22    not offer Government Exhibit 19, and we do not intend to
23    offer it, so we would like to excise that one.  It was the
24    DNA lab report.
25         THE COURT:  It was the lab report containing the
```

```
 1    DNA evidence.  I thought that was listed at the beginning as
 2    the -- but anyway, are you withdrawing it?
 3                MR. HOLLENHORST:  Yes.
 4                THE COURT:  If it was admitted, it's withdrawn.
 5                MR. HOLLENHORST:  And then, Your Honor, one other
 6    housekeeping matter, does the Court typically send the
 7    Government's Exhibit list back?
 8                THE COURT:  No.
 9                MR. HOLLENHORST:  Thank you.
10                THE COURT:  Are you going to tell me somebody else
11    does?
12                MR. HOLLENHORST:  I wouldn't even think of it.
13                MR. DEVORE:  You're the benchmark.
14                THE COURT:  Bring the jury in, would you please?
15                (Jury in).
16                LAW CLERK:  All rise.
17                THE COURT:  Please be seated.
18                We are now going to hear the final arguments of
19    the lawyers.  Under the rules, the government makes a
20    closing argument and then the defense may make a closing
21    argument and then the government has an opportunity for a
22    brief rebuttal.
23                After that, I'll give you your final instructions
24    and then you will retire to begin your deliberations.
25                Government?  Ms. Walcker.
```

```
 1           MS. WALCKER:  Thank you, Your Honor.

 2

 3                 CLOSING ARGUMENTS BY MS. WALCKER

 4           MS. WALCKER:  On June 6th, the Defendant Derrick

 5   Scott was a convicted felon who unlawfully possessed a

 6   firearm.  He didn't just possess any firearm.  He possessed

 7   a machine gun.  That's not all he had.  He had 355 fentanyl

 8   pills highly potent, dangerous drugs that he was going to

 9   sell on the street.

10           Let's start at the beginning.  You saw the

11   defendant drive to the Quick Stop store on June 4th in a red

12   Chevy Tahoe.  You watched the video.  You saw him enter the

13   store and start arguing with the clerk over the price of

14   deodorant.  The defendant pulled a gun out of his bag at the

15   clerk.

16           You heard from the clerk, a man named Muneer

17   Elabed, who reported the gun being drawn on him to the

18   police.  Flash forward 48 hours later, the defendant was in

19   the same red Chevy Tahoe with his girlfriend in the same

20   area of North Minneapolis.  Same license plate, no shirt,

21   same bag.

22           You heard from Sergeant Lepinski that these types

23   of bags are commonly used to carry guns.  You heard that it

24   took an unusually long time to stop.  You heard from Deputy

25   Peterson and Sergeant Lepinski said that that was enough
```

1     time for the time to stash his guns and drugs in the console

2     of the car.

3          You saw the search of the car, how easily the

4     police popped open that hidden compartment.  It had

5     obviously been tampered with before.  Police immediately

6     spotted that switch.  The gun matched the description of the

7     gun the defendant had at the Quick Stop days earlier.  The

8     gun handle was closest to the defendant.  The gun and pills

9     were stashed together.  The pills placed right on top of the

10    gun within the defendant's reach.

11         You just heard from the drug expert Chief Denis

12    Otterness how significant this was, how the defendant

13    carried the gun for his drug sales.

14         You heard from Agent Nate Boyer that when he was

15    arrested, the defendant said, "I will still be the king when

16    I get out.  I'll get another switch when I get out" after

17    his arrest.  He used the word "switch."  He, obviously, knew

18    what a switch was, and he was going to get another.  That

19    was his switch in the car, and he was going to get another

20    switch when he got out.

21         You heard that the defendant's DNA and

22    fingerprints were found on the gun and the gun accessories.

23    At the beginning of this trial, we told you that on

24    June 6th, the defendant possessed a gun, a machine gun and

25    fentanyl.  Now you know that this is what happened, but you

```
 1    also know why, he was going to distribute the Fentanyl.  You
 2    heard from the drug expert the gun was for protection in
 3    case a drug deal went south to defend his title as king.
 4            Members of the jury, you've heard a lot of
 5    testimony, and you've seen many exhibits during this trial,
 6    and we thank you for your attention during this trial.  You
 7    all know what this case is about.  It's now time for you to
 8    consider all of the evidence and decide a verdict in this
 9    case.
10            I now want to talk about the law in this case and
11    explain how the evidence proves that the defendant is guilty
12    beyond a reasonable doubt.
13            The government has to prove each element beyond a
14    reasonable doubt.  Now, Judge Ericksen will tell you that
15    beyond a reasonable doubt does not mean beyond all doubt.
16    It is based on reason and common sense.  Judge Ericksen will
17    also tell you that the presumption of innocence remains with
18    the defendant unless and until the government proves each
19    element of the crime, and that is what we have done in this
20    case.
21            The defendant is charged with four crimes,
22    Count 1 charges the defendant with possessing with the
23    intent to distribute Fentanyl.
24            Count 2 charges the defendant with possessing and
25    carrying a machine gun during and in relation to a
```

1    drug-trafficking crime and in furtherance of a

2    drug-trafficking crime, that is, possessing fentanyl with

3    the intent to distribute it.

4            Count 3 charges the defendant with possessing a

5    machine gun.

6            And Count 4 charges the defendant with being a

7    felon in possession of a firearm.

8            Now, there's two buckets of crimes here.  There's

9    a drug trafficking count, Count 1; and there's the gun

10   counts, Counts 2 through 4.  Let's talk about the drug count

11   first.

12           Count 1 charges the defendant with possessing

13   fentanyl with the intent to distribute it.  Judge Ericksen

14   will instruct you that possession with the intent to

15   distribute fentanyl has three elements.

16           First, the defendant possessed a mixture or

17   substance containing a detectable amount of fentanyl.

18   Second, the defendant knew he possessed a controlled

19   substance.  And, third, the defendant intended to distribute

20   some or all of the fentanyl to another person.

21           As to the first element, did the defendant possess

22   some quantity of fentanyl?

23           Yes, the drugs were next to the defendant within

24   his reach, directly next to his gun and his magazine that

25   had his DNA and his fingerprints, and we know that the drugs

1     contained some fentanyl.  The parties have stipulated about

2     that fact.  The Judge instructed you during trial that you

3     must treat those facts as having been proven.  It's not in

4     dispute.  The defendant possessed the drugs and those drugs

5     were fentanyl.  The evidence proves the first element beyond

6     a reasonable doubt.

7           Now, turning to the second element, did the

8     defendant know he was in possession of a controlled

9     substance?

10          Now, the Judge will instruct you that it does not

11    matter whether the defendant knew the substance was

12    fentanyl.  It's enough that the defendant knew it was some

13    kind of a controlled substance.  The defendant clearly knew

14    that the pills were fentanyl.

15          First of all, the pills were marked as M30 pills.

16    You heard from drug expert Chief Otterness that M30 is a

17    common marking for fentanyl, that fentanyl is distributed

18    using distinctive blue pills with an M30 stamp.  These were

19    very distinctive pills.  Small pills because fentanyl is

20    extremely potent, even a small amount can kill you.  Ask

21    yourselves what else could they be?  These clearly weren't

22    355 pills of Advil or Tylenol.  They said M30.  Use your

23    common sense.  The evidence proves the second element beyond

24    a reasonable doubt.

25          Turning to the final element, element 3, did the

1    defendant intend to distribute some or all of the fentanyl?

2          You heard from drug expert Denis Otterness this

3    morning that they were a distributable amount of fentanyl,

4    that the smaller bag was pre-packaged for distribution.

5    Chief Otterness testified that a user amount of fentanyl is

6    typically one pill or less, that fentanyl is a highly potent

7    substance, that even a small amount as little as two

8    milligrams of pure fentanyl can kill a person.

9          This was 355 pills.  This was not three pills.

10   This was not four pills, this was not five pills.  It was

11   355 pills.  You heard from Chief Otterness that the street

12   value of a single pill of fentanyl in North Minneapolis can

13   range from about $10 to $25 and is valued much higher

14   elsewhere.  In this case, there were 355 pills valued at

15   least at $3,500 and up to more than $8,000.  The defendant

16   had the pills because he was going to sell them on the

17   street.  He was going to sell them on the street for a lot

18   of money.

19         What evidence do we have of distribution?  One of

20   the things you can consider is the defendant's March 2020

21   drug sale.  Now, this evidence is not to be used to show

22   that the defendant sold drugs then so he was selling drugs

23   now.  It's to show his intent in possessing the fentanyl,

24   that he intended to distribute the drugs.

25         You heard from Sergeant Dubay that the defendant

1    sold drugs in a controlled buy from his vehicle in North

2    Minneapolis.  He sold fentanyl, cocaine and heroin, 62

3    bindles.  You heard Sergeant Dubay call this area a drug

4    market.  You heard that it's only about 15 blocks from where

5    the defendant was caught on June 6th with the fentanyl,

6    similar facts here.  You saw that the 62 bindles of drugs

7    were found stashed in his pants after that drug sale.  You

8    saw that video.  The evidence has proven all three elements

9    beyond a reasonable doubt.

10          The defendant is guilty of Count 1, beyond a

11   reasonable doubt.

12          Now, let's talk about the second group of charges

13   here, the gun charges, Counts 2 through 4.  Now, there's a

14   lot of overlap between these charges.  For all three of the

15   charges, you need to find that the defendant knowingly

16   possessed the gun, so let's talk about that first.

17          How do we know that the defendant knowingly

18   possessed the gun?  First of all, where was the gun?  It was

19   directly within his arm's reach right next to him in the

20   vehicle.  He could have reached down and grabbed the gun.

21   The handle was facing him.

22          Members of the jury, if that's all you heard, that

23   would be enough for you to find the defendant in possession

24   of the gun.  But there's more.

25          How else do we know he possessed it?  His DNA.

1   You heard from forensic scientist this morning Kaaren Simon

2   that the defendant's DNA was found on the gun.  His DNA was

3   also found on the magazine that holds the ammunition for

4   that gun.  His fingerprint was also found on the magazine

5   with the gun.

6          Now, you heard there was another person in the

7   vehicle with the defendant, Mikita Jackson.  Her DNA was not

8   on the gun.  Her DNA was not on the magazine.  Members of

9   the jury, how does your DNA get on an object?  How does it

10  get on the gun?  By touching it.  The defendant clearly

11  touched it.  He was in possession of the gun.  Use your

12  common sense.

13         Finally, you saw video footage, and you heard

14  testimony from the Quick Stop clerk about how the defendant

15  threatened him with a gun two days earlier.  The gun matched

16  this description of the gun.  He pulled it from the same bag

17  he was wearing when he was stopped on June 6th.  What does

18  all of this evidence tell you?  There is no question that

19  the defendant possessed the gun on June 6th.

20         Now, let's talk about the three gun charges in

21  more detail.  Let's start with the easiest first, felon in

22  possession of a firearm, Count 4.  Judge Ericksen will

23  instruct you that the crime of being a felon in possession

24  of a firearm has four elements.

25         First, the defendant had been convicted of a crime

1    punishable by imprisonment for more than one year.  In other

2    words, he was a felon.

3           Second, the defendant knew he had been convicted

4    of a crime punishable by imprisonment of more than one year.

5    In other words, he knew he was a felon.

6           Third, after that, the defendant knowingly

7    possessed the firearm.

8           And, fourth, the firearm crossed the state or

9    national line at some point before the defendant possessed

10   it on June 6th.

11          We just talked about the third element,

12   possession.  The gun was within his arm's reach, his DNA,

13   his fingerprints.  You can find this element beyond a

14   reasonable doubt.

15          Now, the defendant has stipulated or agreed to the

16   other three elements:  Elements 1, 2, and 4.  Judge Ericksen

17   has instructed you that you are take these stipulations as

18   facts or as proven.  The defendant has stipulated that he

19   was convicted of a crime punishable by a term of

20   imprisonment exceeding one year and that he knew he had been

21   convicted of a crime punishable by a term of imprisonment

22   exceeding one year.  In other words, the defendant was a

23   felon, and he knew he was a felon.  You can find that fact

24   as proven.

25          The parties have also stipulated that the firearm

1    was manufactured outside of the State of Minnesota.  In

2    other words, the gun necessarily had to cross a state line

3    in order to be in Minnesota on June 6th when the defendant

4    possessed it.  You can find that element as proven.

5         The evidence has proven all four elements beyond a

6    reasonable doubt.  The defendant is guilty of Count 4.

7         Now, let's talk about Count 3, which charges the

8    defendant with possessing a machine gun.  Count 4 charges

9    the defendant with possessing a firearm as a felon.  This

10   count, Count 3, charges the defendant with possessing

11   machine gun, specifically, which is an illegal type of gun

12   to possess.

13        Judge Ericksen will instruct you that there are

14   three elements for Count 3:

15        First, the defendant knowingly possessed the

16   firearm.

17        Second, that the firearm was a machine gun.

18        And, third, that the defendant knew the gun was a

19   machine gun or he was aware of the firearm's physical

20   characteristics that made it a machine gun, and you can find

21   either, but the government has proven both in this case.

22        And we already talked about possession, element 1.

23   You can find that the evidence has proven the first element

24   beyond a reasonable doubt.

25        Turning to the second element, that the firearm

1    was a machine gun.  There was a stipulation that the gun was

2    a machine gun.  You can find that element 2 has been proven

3    beyond a reasonable doubt.

4         That leaves the third element, that the defendant

5    knew the firearm was a machine gun or that he was aware of

6    the firearm's physical characteristics that made it a

7    machine gun.  How do you know that the defendant knew that

8    the gun was a machine gun or that it had a switch?

9         First, the defendant's own words.  You heard Agent

10   Boyer testify that when the defendant was arrested, he said

11   he would get another switch when he got out.  The defendant

12   brought up the word "switch".  Members of the jury, you

13   don't use the word switch if you don't know what a switch

14   is.  He knew what a switch was, and he was going to get

15   another one.

16        The defendant also had a loaded high capacity

17   magazine with his DNA and his fingerprint.  You heard that

18   the high capacity magazine could hold 24 rounds of

19   ammunition.  You have an extended magazine if you have a

20   switch.  After all, that is what a switch is designed to do

21   to fire numerous rounds of ammunition within seconds.  He

22   knew it was a switch.

23        You heard from ATF expert Anthony Arena yesterday

24   that switches have physical characteristics that are unique,

25   that are distinctive.  That is a significant part of the

1    gun.  Use your common sense.  You don't need to be an expert

2    to see the switch on the back end of the firearm.  It's not

3    what it looks like in movies.  Use your common sense.

4           You heard the testimony of the Quick Stop clerk

5    who testified that he saw the defendant with a gun on

6    June 4th, that the gun matched the physical description of

7    the gun that the defendant was found with on June 6th.  He

8    had the gun for at least two days, maybe more that we know

9    of.  He had plenty of time to become familiar with the

10   physical characteristics of the gun.

11          The evidence has proven the third element beyond a

12   reasonable doubt.  The defendant is guilty of Count 3.

13          Now turning to the final count, Count 2, which

14   charges the defendant with possessing and carrying a machine

15   gun in furtherance of and during and in relation to a

16   drug-trafficking crime.  Judge Ericksen will instruct you

17   that there are three elements for Count 2:

18          First, the defendant committed the crime of

19   possession with the intent to distribute fentanyl.  This is

20   the drug-trafficking crime that's been charged in Count 1.

21          Second, the defendant knowingly possessed the

22   firearm equipped with a switch in furtherance of that

23   drug-trafficking crime or the defendant carried the firearm

24   during and in relation to a drug-trafficking crime or both.

25   In essence, there's two ways that this element can be

1    proven, and the government has proven both.  They're very

2    similar.

3             Third, the firearm was a machine gun.  Now, we've

4    already talked about the first and the third elements.  We

5    talked about the first element earlier when we discussed the

6    drug count, Count 1, how the evidence proves that the

7    defendant possessed the fentanyl with the intent to

8    distribute it.  We also talked about the machine gun,

9    Count 3.  You can assume that element is proven.

10            That leaves the second element.  Did the defendant

11   knowingly possess the firearm in furtherance of and during

12   in relation to the drug-trafficking crime?  We've already

13   talked about possession, how the defendant knowingly

14   possessed the firearm.  The only issue to address is whether

15   the defendant possessed the firearm during and in relation

16   to a drug-trafficking crime or in furtherance of a

17   drug-trafficking crime.

18            You heard the testimony of Sergeant Adam Lepinski

19   that the gun was found directly next to the drugs.  Next to

20   the bag of fentanyl pills that the defendant planned to sell

21   on the street.  You saw videos and pictures of the 355

22   fentanyl pills, the bag directly on top of the gun within

23   the defendant's reach.  The defendant was carrying them in

24   his bag, the same bag he was carrying a gun in days earlier

25   until the police pulled him over, then he stashed them

1   directly next to him in the center console.  You can see the

2   handle facing him where he had stashed it.  He was clearly

3   carrying it in relation to the drugs.

4           You heard the extensive testimony of Chief Denis

5   Otterness this morning about the inherent danger of drug

6   trafficking, how firearms are used to protect the trade,

7   protect the drug sales.

8           You heard Chief Otterness testify about the street

9   value of a bag of fentanyl pills.  He testified how a bag of

10  -- how only one pill can range from about 10 to $25.  Here

11  the defendant had 355 pills.  That's valued at more than

12  $3,500 and up to more than $8,000 on the street.  He was

13  possessing the drugs, and he was possessing the gun.  He was

14  using the gun to protect his drugs in furtherance of

15  possessing with the intent to distribute them.

16          Members of the jury, use your common sense.  The

17  defendant had the gun because he was selling fentanyl pills

18  on the street.  You can find that the evidence has proven

19  the second element.  The defendant is guilty of Count 2.

20          Now, after rendering your verdict on Count 2,

21  Judge Ericksen will instruct you that you are to answer one

22  additional question for this count if you find that the

23  defendant is guilty.  You will be asked to answer whether

24  the defendant knew the firearm was a machine gun or was

25  aware of the gun's physical characteristics that made it a

1    machine gun.

2              We've already answered this question, which is an

3    element of Count 3.  The evidence proves that the answer is

4    yes.

5              Members of the jury, this is a straightforward

6    case.  On June 6th, the defendant stashed the gun and the

7    fentanyl when the police pulled him over.  He was hiding the

8    guns and the drugs.  He was possessing the gun and the

9    fentanyl with the intent to distribute it.  At that time, he

10   was a convicted felon.

11             Members of the jury, rely on your common sense

12   here.  Based on all this evidence, we ask you to return a

13   verdict of guilty as to all counts.  Thank you.

14             Thank you, Ms. Walcker.

15             Mr. DeVore?

16

17             **CLOSING ARGUMENTS BY MR. DEVORE**

18             MR. DEVORE:  Good morning.

19             Yesterday I stood in front of you, and I told you

20   the most important thing is to hold the government to the

21   strongest burden of proof that we have in our legal system,

22   which is proof beyond a reasonable doubt.  And I told you

23   what the evidence was going to be in this case, and it came

24   in exactly as the way I said it would come in.

25             We have a Tahoe that was pulled over by the

1    police.  We have a search of the vehicle.  Mikita Jackson

2    was driving the Tahoe.  Mr. Scott was in the passenger seat.

3    They found a gun and a bag of drugs.  That's all they have.

4         Everything that you heard about the intent to sell

5    or the intent to use a machine gun to further the sale of

6    drugs is complete speculation.  They have no evidence to

7    prove that.  They have no undercover CI's.  They have no

8    recorded videos.  They have no -- anything out there, no

9    admissions, nothing to say that what Mr. Scott was doing, if

10   they can prove that he possessed the drugs, what he intended

11   to do with those drugs.  Zero.

12        Why is that important?  Because the burden is on

13   the government.  It's their case.  They brought this case.

14   They charged Mr. Scott with these crimes.  Our system of law

15   is such that when a government brings the case against an

16   individual, they have to prove the case.  They have to prove

17   all of the elements.  And you as the jury have to go back

18   and decide whether or not they've done that.

19        And we talked about the level of proof, proof

20   beyond a reasonable doubt.  It's not beyond all possibility

21   of doubt.  Nobody would hold you to that level of certainty,

22   but it should be such certainty level that you feel good

23   about the decision, that you don't have a nagging suspicion

24   that I don't know.  I don't know if I feel quite right about

25   that or if there was a question that should have been asked

1     or if there was a piece of information that should have been

2     explained a little bit further.  That's not on Mr. Scott or

3     me to clarify or to fix that or fill in that gap or fix that

4     hole or what have you.  That's a hundred percent on the

5     government.

6          Why is that important?  Because the government

7     wants you, just like I told you yesterday morning, the

8     government wants you to take and jump over some stuff that

9     they don't really have good explanation for.  They don't

10    have proof what Mr. Scott -- if they can prove that he

11    possessed the drugs, what he intended to do with the drugs.

12    They just make this leap, and they bring in an officer that

13    testifies based on his knowledge, but they don't have any

14    proof.  They have speculation.

15         Now, when I heard Chief Otterness testifying this

16    morning, I heard him use word like "typical."  Typical.  The

17    government has a burden of proof to show beyond a reasonable

18    doubt.  It's not typical.  We're not here to argue about

19    what's typically done on the streets.  We're here to argue

20    about whether or not Mr. Scott committed the crime.

21         The 2020 case.  It's brought in, that's the 62

22    bindles.  Why was that brought in, right?  That's not what

23    Mr. Scott is on trial for.  Okay.  It's brought in for the

24    government to show intent.  Okay.  We all know the effect of

25    that and what the real meaning of that is, but look at the

1      differences in some of that.

2              And we heard Chief Otterness testify today that

3      it's so common that the guns are used to protect drugs

4      because it's a dangerous business, right?  Well, they

5      introduced evidence of Mr. Scott being arrested and drugs

6      being seized 62 bindles.  No gun.  Okay.  No gun involved.

7              And look at even the difference in the way that

8      that packaging was done.  All rolled up into little bindles,

9      right?  They made a big deal about these bindles.  They put

10     them in the corner, they pull them up, and they twist them

11     up and that's what people buy, right?  That's exactly the

12     stuff that Chief Otterness is talking about.

13             What's the difference between that and this case?

14     This case there's just a bag of pills, right?  That's all we

15     had, right?  They're asking you to say, okay, take that bag

16     of pills, find that Mr. Scott possessed those, even though

17     there was no DNA evidence or anything linking Mr. Scott to

18     the drugs, right?  And they want you to then make that jump

19     and say because he had these drugs and because he had that

20     gun, that meant that he was going to sell the drugs, and it

21     meant he was going to use this gun to further his sale of

22     the drugs.  And they used Chief Otterness to prove that

23     point.

24             You have to decide whether or not Chief

25     Otterness's testimony, who had nothing to do with this case,

1      wasn't involved in the arrest, all he was brought in from

2      Fargo, from North Dakota, he was brought in to testify about

3      what's typical.  I submit to you that typical is not enough

4      when we're talking about proof beyond a reasonable doubt.

5             Now, Kaaren Simon testified today about the DNA on

6      the gun, but she couldn't tell you where the swabs were

7      taken from from the gun, so we don't know if it was on the

8      handle, on the barrel, or where it was from, so there was no

9      evidence offered to you regarding any DNA evidence

10     connecting Mr. Scott to the actual switch.

11            So why is that important?  Because he's got to

12     know that there's a switch on that gun.  He's got to know

13     what a switch is that made it a machine gun.  Again, ask

14     yourself what is the evidence that they presented to you to

15     prove that point?

16            And, by the way, the store clerk, we heard

17     testimony in evidence from the store clerk at the Quick Stop

18     from an incident two days prior.  I didn't hear that witness

19     identify Mr. Scott.  I heard him talk about a man.  Okay.

20     Just a point.  Again, it's a point if it was something that

21     should have been addressed, covered, fixed by the

22     government, it's one of those things that if it wasn't done

23     right, then you got to hold it against the government.

24            In the end, you have to decide whether or not the

25     evidence is sufficient to show that Mr. Scott, number one,

1     that he possessed those drugs in the car that belonged to

2     Mikita Jackson.

3              Number two, that he intended to sell those drugs

4     or distribute those drugs.

5              On Count 1, that's the possession with intent to

6     distribute, the critical element is whether or not the

7     government can prove that Mr. Scott possessed those drugs

8     with the intent to sell or distribute, and I submit to you

9     that they have failed to prove that point.

10             They want you to make the leap, make sure the

11    facts are there, make sure the evidence is sufficient and

12    that it was proven beyond a reasonable doubt for you to make

13    that decision.  And if you listen to the limited testimony

14    that we have regarding Mr. Scott's involvement, not just

15    opinions, they failed.  They can't prove that count.

16             And, quite simply, if they can't prove Count 1,

17    they can't prove Count 2, because Count 2 requires finding

18    Mr. Scott guilty of Count 1.  You have to find that he was

19    possessing the drugs with the intent to distribute as the

20    first element and then you move into the gun.  Right?  And

21    even there they have to prove beyond that that he used that

22    gun in furtherance of, in relation to the distribution of

23    the drugs.

24             Again, what evidence did they offer you, factual

25    evidence did they offer you to prove that point?  Or was it

1    just opinion and speculation?  That's all that was.  So the

2    government is going to, on Count 2, the government fails on

3    the first two elements.

4            Now, with respect to Count 3, they still have to

5    prove that Mr. Scott knew that that gun was a machine gun or

6    had machine gun capabilities.  Again, you'll have to decide

7    whether or not the government met that burden of proof.

8    There's no specific evidence that they offered to prove that

9    point, and I submit to you that they have failed on that

10    count as well.

11            Finally, the last one is the possession of a

12    firearm by a felon.  I'll let you guys decide that whether

13    or not the government has proved each one of those elements,

14    but I want you to really think about what it is that they

15    provided to you that said Mr. Scott possessed the drugs, and

16    he intended to sell them or distribute them and that he

17    possessed the firearm, the machine gun, for the purpose of

18    selling those drugs.

19            When you go back into the deliberation room,

20    you're going to have a chance to talk with each other and

21    talk about what evidence the government put forth.

22    Mr. Scott didn't present any evidence, but he doesn't have

23    to.  Mr. Scott didn't testify, but he doesn't have to.

24    That's because he's presumed innocent until the government

25    and unless the government proves him guilty beyond a

```
 1    reasonable doubt.
 2           The government has failed to prove their case
 3    against Mr. Scott.  And if you find that the government has
 4    failed to do that, then you should find him not guilty.
 5    That's what we ask you to do here today.  Tell the
 6    government they failed to prove their case.  Mr. Scott is
 7    not guilty.
 8           Thank you.
 9           THE COURT:  Thank you, Mr. DeVore.
10           Ms. Walcker, anything else?
11
12                 REBUTTAL ARGUMENTS BY MS. WALCKER
13           MS. WALCKER: Members of the jury, I won't keep you
14    much longer.  Use your common sense.  Trust your common
15    sense.  I want to spend the next few minutes talking about
16    some of the points the defense counsel just raised, but keep
17    in the back of your mind trust your common sense.
18           The defense has just suggested that the government
19    must prove everything beyond a reasonable doubt.  For
20    example, the government must prove that the man that entered
21    the Quick Stop store on June 4th, two days earlier, was the
22    defendant.  But that's not the standard.  The government
23    must only prove all of the elements of the crimes charged
24    beyond a reasonable doubt, not all of the facts.
25           Now, the evidence is strong that the man who
```

 1    entered the Quick Stop store two days earlier was in fact

 2    the defendant.  Just because the clerk had never met, didn't

 3    know the name of the defendant, does not mean it wasn't him.

 4    Sergeant Lepinski identified him as the defendant.  And you

 5    can watch the videos for yourselves.  You can see the man

 6    sitting right here.  It is clearly Derrick Scott.  There's

 7    no question.  There's no evidence to the contrary.  Use your

 8    common sense.

 9          The defense also argues that the bag of blue pills

10    in the car next to the defendant by its nature is not enough

11    to show his intent to distribute.  That even if you assume

12    that the pills were there, that's not evidence of his intent

13    to distribute, that there was no recording of a confidential

14    informant or a controlled buy there.

15          First of all, members of the jury, the defendant

16    is not charged with distribution.  He is not charged with

17    distributing fentanyl.  He is charged with possession of

18    fentanyl with the intent to distribute it.  The government

19    is not required to prove that he distributed the pills.  The

20    government must only prove that he possessed the pills with

21    the intent to distribute it.  The government has clearly

22    proven this.  He clearly possessed the fentanyl.  It was

23    within his arm's reach next to the gun with his DNA, next to

24    the magazine with his DNA, his fingerprints.  Members of the

25    jury, we've gone through all of this evidence.

1          Now, with respect to the defendant's intent, we

2    all know there is no way of getting into the defendant's

3    head.  The only way that we can do that is if the defendant

4    tells you what is in his head, but you can logically infer

5    what's in a person's head by his actions.

6          Now, remember, Judge Ericksen instructed you that

7    there is no difference between what's called direct and

8    circumstantial standing evidence.  What does this mean?

9          Say this morning you open your front door and you

10   see footsteps in the snow leading up to your front door.

11   You didn't see anyone come up to your door.  You didn't hear

12   the doorbell ring, but you can see the footprints in the

13   fresh fallen snow leading up to your door.  You can

14   logically infer that someone has come to your front door.

15   That's circumstantial evidence, and it's to be given the

16   same weight as direct.  They are the same.  There is no

17   distinction in the law.

18          So you don't need the defendant to tell you what's

19   in his head because he planned to sell the fentanyl.  You

20   know this from the evidence.  You don't carry 355 highly

21   potent dangerous fentanyl pills for personal consumption.

22   You don't.  Think about it.  Those are the options.  355

23   highly dangerous potent fentanyl pills for personal use or

24   for distribution?  There's no other reasonable explanation.

25   Use your common sense.

```
1            You heard that these pills are valued at more than
2     $3,500 on the street.  Pills that are extremely dangerous in
3     small dosages.  This was a distribution amount.  One of the
4     bags was already pre-packaged for distribution.  This is not
5     complete speculation.  Circumstantial evidence is not
6     speculation.  Use your common sense.  Don't check it at the
7     door.
8            Now, remember that this case started as a gun
9     investigation.  You heard about the March 2020 incident.
10    That started as a drug investigation.  This was different.
11    The police were investigating the defendant for a gun.
12    There was no controlled buy or confidential informant
13    because they were focused on the gun, but you don't ignore
14    the evidence that was found in the vehicle with the gun, the
15    355 fentanyl pills.
16           Now, you heard Chief Otterness explain how this
17    all fits together, that he had the gun to protect his drugs,
18    that he was going to sell them.  There's no leap to conclude
19    that the drugs were there because the defendant owned them,
20    and he intended to sell them.  There is simply no other
21    reasonable explanation for the defendant's possession of the
22    drugs other than for distribution, plain and simple.
23           Now, the defense also made a few points about the
24    forensic testing, about the DNA.  What he failed to mention
25    is that Sergeant Lepinski testified yesterday that the gun
```

1    and the magazine were both swabbed for the defendant's DNA,

2    that those were sent to the lab for testing.  You heard from

3    the DNA forensic scientist Kaaren Simon this morning that

4    that DNA was a direct match.  There was no other

5    explanation.  It was his DNA on the gun.

6         But even if you disregard that, his fingerprints

7    were also found on the magazine directly next the gun, the

8    part that goes into this very same gun.  You saw that

9    fingerprint stipulation.  You know they did forensic testing

10   on the gun.  They looked for fingerprints.  His DNA, his

11   fingerprints.

12        But you don't know forensics in this case either

13   because the defendant was literally sitting next to the gun.

14   He had it right there.  There is no question that he touched

15   the gun.

16        Members of the jury, what you have learned in this

17   trial is that the defendant was unlawfully in possession of

18   a machine gun and fentanyl with the intent to distribute it.

19   Consider all of the evidence.  Look at all of those things

20   together when considering your verdict and return the only

21   verdict that is consistent with all of the evidence in this

22   case and that is guilty on all four counts.  Thank you.

23        THE COURT:  Thank you, Ms. Walcker.

24

25             **FINAL JURY INSTRUCTIONS**

1          THE COURT:  All right.  Members of the jury, I'm

2     now going to give you my final instructions.  Before I do

3     that, I have to dismiss our alternate juror.  And the

4     alternate is Bruce Lindert.  So, Mr. Lindert, if you would

5     just go back to the jury room, collect anything you have,

6     and then Cathy, who was sitting here, will meet you there,

7     and she'll give you further instructions.

8          JUROR:  Thank you, Your Honor.

9          THE COURT:  Yes.  And I'll come back and chat you

10    with you.  Thank you very much.  Would you like to stand up

11    where you are and just take a stretch?  Why don't you do

12    that?  Don't leave though.

13         All right.  Now the instructions I gave you at the

14    beginning of the trial and during the trial all remain in

15    effect, but I'm going to give you additional instructions

16    now.  Of course, you have to follow the instructions I gave

17    you earlier as well as those I give you now.  You must not

18    single out some instructions and ignore others.  They're all

19    important, not all of the ones I gave you at the beginning

20    are going to be repeated here.

21         It's your duty to find from the evidence what the

22    facts are, and then you apply the law as I give it to those

23    facts.  You must follow my instructions on the law even if

24    you thought the law was something different or that it

25    should be different.  The law demands of you a just verdict

1    unaffected by anything except the evidence, your common

2    sense, and the law as I give it to you.

3             To review evidence, I went through this at the

4    beginning, but it consists of the testimony of witnesses and

5    the documents and other things received as exhibits and the

6    facts that have been stipulated.  That is, formally agreed

7    to by the parties.  And you can use your reason and your

8    common sense to draw deductions or conclusions from facts

9    that have been established by the evidence in this case.

10            Remember that certain things are not evidence.

11   Statements, argument, questions, comments by lawyers

12   representing the parties are not evidence in the case.

13            Objections aren't evidence.  If I sustained an

14   objection to a question, ignore the question and, you know,

15   don't try and think what the answer might have been.  I

16   don't think we had any big instances of that, but that law

17   remains as I told you at the beginning.

18            If you might have seen something or heard

19   something outside of the courtroom.  That's not evidence.

20   And then there was a piece, there was some evidence that was

21   received for a limited purpose only and that's only evidence

22   for that limited purpose.  I'm going to talk to you a little

23   bit more about that in a minute.

24            When you decide what the facts are, you may have

25   to decide what testimony you believe or don't, and remember

1    that you can believe everything that a witness said or none

2    of it or only part of it.  In deciding what to believe, you

3    can consider the witness's apparent intelligence, their

4    chance to have seen or heard the things that they testified

5    about, their memory, any motives they might have for

6    testifying a certain way, their manner while testifying and

7    whether they said something different at an earlier time and

8    the general reasonableness of their testimony.  And, of

9    course, as you recall, the extent to which the testimony is

10   consistent with any evidence you believe.

11          Keep in mind that people sometimes hear things

12   differently or see things differently and sometimes they

13   forget things.  You need to consider whether if there was a

14   contradiction, it's an innocent misrecollection or a lapse

15   of memory or an intentional falsehood and that may have to

16   do with whether it's an important fact or an unimportant

17   detail.

18          Now, the indictment in this case charges four

19   different crimes.  You are going to pay attention to each

20   one separately.  So just because you have a verdict of

21   guilty or not guilty on one doesn't mean you have to --

22   consider them each separately.

23          Count 1 is possession with intent to distribute

24   fentanyl.

25          Count 2 charges possessing and carrying a machine

1    gun in furtherance of and during and in relation to a

2    drug-trafficking crime.

3            Count 3 charges commission of a crime, the crime

4    of possession of a machine gun.

5            And Count 4 charges that the defendant committed

6    the crime of being a felon in possession of a firearm.

7            The defendant has pleaded not guilty to each of

8    those charges.

9            And the indictment was the document that formally

10   charged the defendant and got this trial process going.

11   It's not evidence.  At the beginning of trial, I instructed

12   you that you have to presume the defendant to be innocent

13   and, thus, the defendant began the trial with a clean slate

14   with no evidence against him.

15           The presumption of innocence alone is sufficient

16   to find a defendant not guilty and can be overcome only if

17   the government proves during a trial beyond a reasonable

18   doubt each element of the crime charged.

19           Again, each count charges a separate crime.

20   Consider each count separately and return a separate verdict

21   for each count, and there will be a verdict form for you.

22           There is no burden on a defendant to prove that he

23   is not guilty.  Instead, the burden of proof remains on the

24   government throughout the trial.  The law never imposes on a

25   defendant in a criminal case the burden or duty of calling

1    any witnesses or producing any evidence.  The fact that the

2    defendant did not testify must not be considered by you in

3    any way or even discussed in arriving at your verdict.

4            Count 1, the crime of possession with intent to

5    distribute fentanyl.  Three elements.  The defendant was in

6    possession of fentanyl.  Two, the Defendant knew that he was

7    in possession of a controlled substance.  And, three, the

8    defendant intended to distribute some or all of the fentanyl

9    to another person.

10           If you find these elements unanimously and beyond

11   a reasonable doubt, then you must find the Defendant guilty

12   of the crime of possession with intent to distribute

13   fentanyl.  Record your determination in paragraph 1 of the

14   verdict form.

15           Some definitions.  "Distribute" as used in these

16   instructions means to deliver or to transfer possession or

17   control of something from one person to another.  The term

18   to distribute includes the sale of something by one person

19   to another.

20           The definition of "with intent to distribute"

21   means to have in mind or to plan in some way to deliver or

22   to transfer possession or control over a thing to someone

23   else.

24           In attempting to determine the intent of a person,

25   you may take into consideration all of the facts and

1      circumstances shown by the evidence received in the case

2      concerning that person.

3              In determining a person's intent to distribute

4      controlled substances, you may consider among other things

5      the purity of the substance, the quantity of the substance,

6      the presence of equipment used in processing or sale of

7      controlled substances, weapons, cash.

8              The government must prove beyond a reasonable

9      doubt that the defendant intended to distribute the

10     controlled substance alleged in the indictment.

11             Now, you heard testimony that was admitted for a

12     limited purpose, and this was the testimony that the

13     defendant sold a quantity of drugs to a police informant in

14     2020, March 23rd of 2020 in North Minneapolis, followed by

15     his arrest in which he was found in possession of 62 small

16     bindles of suspected drugs that later tested positive for

17     fentanyl-laced heroin and cocaine.  You may consider this

18     evidence only if you unanimously find that it's more likely

19     true than not true that the defendant committed that act.

20             This is a lower standard than proof beyond a

21     reasonable doubt, and you decide that by considering all the

22     evidence related to that 2020 incident and then deciding

23     whether that is more believable.

24             If you find that it hasn't been proved, then, of

25     course, disregard it.  If you find that it has been proved,

1    then you can consider it but only for the limited purpose of

2    deciding whether the defendant had the state of mind or

3    intent necessary to commit the crime charged in Count 1,

4    namely, the intent to distribute fentanyl.  Give this

5    evidence the weight and value that you believe it's entitled

6    to receive.

7            Even if you find that the defendant may have

8    committed a similar act in the past, that's not evidence

9    that he committed an act in this case.  You can't convict a

10   person simply because you believe he may have committed

11   similar acts in the past.  The defendant is on trial here

12   only for the crimes charged in the indictment, and you may

13   consider the evidence of prior acts only on this issue of

14   the state of mind or intent with respect to Count 1.

15           Now, a controlled substance includes fentanyl.

16   Fentanyl has a technical name.  I'm trying to tell you what

17   the statute calls it:

18   N-phenyl-N[1-(2-phenylethyl)-4-piperidinyl]propenamide.

19   It's a controlled substance.  It is solely for you to

20   determine whether or not the government has proven beyond a

21   reasonable doubt that the defendant possessed with intent to

22   distribute fentanyl as charged in Count 1 of the indictment.

23           A note on possession.  There is several kinds of

24   it.  It can be actual or constructive.  A person can be in

25   possession solely or jointly.

1          A person who knowingly has direct physical control

2     over a thing, at a given time, then is in actual possession

3     of it.

4          A person who, although they're not in actual

5     possession, has both the power and the intention at a given

6     time to exercise dominion or control over a thing, either

7     directly or through another person, is then in constructive

8     possession of it.

9          If one person alone has actual or constructive

10    possession, possession is sole.  If two or more share actual

11    or constructive possession, possession is joint, but this is

12    all possession.  Whenever the word possession is used in

13    these instructions, it includes actual as well as

14    constructive and sole as well as joint.

15         Now, Count 2, the crime of possessing a firearm in

16    furtherance of a drug-trafficking crime and carrying a

17    firearm during and in relation to a drug-trafficking crime

18    is charged in that second count has three elements:

19         One, the defendant committed the crime of

20    possession with intent to distribute fentanyl as charged in

21    Count 1.

22         Two, the defendant knowingly possessed a firearm,

23    that is a Glock 41, .45-caliber pistol serial number ADSF311

24    equipped with a switch in furtherance of that crime or

25    knowingly carried that firearm during and in relation to

 1    that crime or both;.

 2            Third, that the firearm was a machine gun.

 3            If you find that the defendant proved these three

 4    elements beyond a reasonable doubt, then you will be asked

 5    to find whether the government has proven a fourth element

 6    beyond a reasonable doubt and that is that the defendant

 7    knew the firearm was a machine gun or was aware of the

 8    firearm's physical characteristics that made it a machine

 9    gun.

10            What's a "firearm"?  A firearm is any weapon, and

11    it includes a starter gun, which will or is designed to or

12    may readily be converted to expel a projectile by the action

13    of an explosive.  The frame or receiver of any such weapon,

14    any firearm muffler or firearm silencer or any destructive

15    device.  Those are all included in the definition of a

16    weapon.

17            The term "machine gun" is any weapon that shoots,

18    is designed to shoot or can be readily restored to shoot

19    automatically more than one shoot without manual reloading

20    by the single function of the trigger.  The term also

21    includes the frame or receiver of any such weapon, any part

22    designed or intended solely and exclusively, or by a

23    combination of parts designed and intended for use in

24    converting a weapon into a machine gun.  Any combination of

25    parts for which a machine gun can be assembled if such parts

1    are in possession or control of a person.

2    "In furtherance of" means furthering, advancing,

3    or helping forward.  This means the government must prove

4    the defendant possessed the firearm with the intent that it

5    advance, assist or help commit the crime, but the government

6    need not prove that the firearm actually did so.

7    You may find that a firearm was "carried" during

8    the commission of a crime of possession with intent to

9    distribute fentanyl if you find that the defendant was

10    transporting a firearm in a vehicle.

11    In determining whether a defendant carried a

12    firearm during and in relation to a drug-trafficking crime,

13    you may consider all of the factors received in evidence in

14    the case including the nature of the underlying

15    drug-trafficking crime alleged, the proximity of the

16    defendant to the firearm in question, the usefulness of the

17    firearm to the crime alleged, and the circumstances

18    surrounding the presence of the firearm.

19    Count 2 alleges two means by which the offense can

20    be committed:  Either by possessing a firearm in furtherance

21    of a drug-trafficking crime; or by carrying a firearm during

22    and in relation to a drug-trafficking crime.  If the first

23    three elements have been proved beyond a reasonable doubt as

24    to one or both of these meanings of committing the crime,

25    then you must find the defendant guilty of the crime charged

1    under Count 2, otherwise you must find the Defendant not

2    guilty of that crime.

3            And you can record your verdict and what you'll

4    see as paragraph 2A of the verdict form.

5            If you unanimously find the defendant guilty of

6    Count 2, then you must also complete paragraph 2B, which

7    asks you to decide the means by which the defendant

8    committed the offense, namely, whether you unanimously find

9    that the defendant possessed a firearm in furtherance of a

10   drug-trafficking crime or; two, that you unanimously find

11   that by carrying a firearm during and in relation to a

12   drug-trafficking crime or by both means.  So when it comes

13   to 2B, you could, if you come to that, check either one or

14   two or both, but it couldn't be a situation where, for

15   example, six think it's one and six think it's the other.

16   You would have to unanimously agree before you put any check

17   on either of those marks because your decisions have to be

18   unanimous.

19           If you unanimously find the defendant guilty of

20   Count 2, then you must also complete paragraph 2C, which

21   asks you to decide the fourth element as described above,

22   and that is whether you unanimously find that the defendant

23   knew the firearm was a machine gun or was aware of the

24   firearm's physical characteristics that made it a machine

25   gun.

1             Count 3, possession of a machine gun.  The

2      elements are:

3             One, the defendant knowingly possessed the firearm

4      described in Count 3 of the indictment, which is the Glock

5      41, .45-caliber pistol, serial number ADSF111, equipped with

6      a switch.

7             Two, the firearm was a machine gun.

8             And, three, the defendant knew the firearm was a

9      machine gun or was aware of the firearm's physical

10     characteristics that made it a machine gun.

11            If all of these elements have been proved beyond a

12     reasonable doubt as to the defendant, then you must find the

13     defendant guilty of the crime charged under Count 3;

14     otherwise you must find the defendant not guilty of that

15     crime, and record your verdict in paragraph 3.

16            Count 4, it's a crime for a felon to possess a

17     firearm.  This crime has four elements as charged in Count 4

18     of the indictment:

19            One, the defendant had been convicted of a crime

20     punishable by imprisonment for more than one year;

21            Two, after that, the defendant knowingly possessed

22     a firearm, that is a Glock 41, .45-caliber pistol, serial

23     number ADSF311, equipped with a switch as described in

24     Count 4 of the indictment.

25            Three, at the time the defendant knowingly

1    possessed the firearm, he knew he had been convicted of a

2    crime punishable by imprisonment for more than one year;.

3                And, four, the firearm had been transported across

4    the state line at some time during or before the defendant's

5    possession of it.

6                You are instructed that the government and the

7    defendant have agreed that the defendant has been convicted

8    of a crime punishable by imprisonment for more than one year

9    under the State of Minnesota's laws, and you must,

10    therefore, consider this first element as proven.

11                You are instructed that the government and the

12    defendant have agreed that the defendant knew he had been

13    convicted of a crime punishable by imprisonment for more

14    than one year under the laws of the State of Minnesota, and

15    you must consider the third element, therefore, as proven.

16                The government and defendant have agreed that the

17    firearm alleged in Count 4 of the indictment was

18    manufactured in a state other than the State of Minnesota

19    and that the firearm therefore meets the definition of the

20    term "firearm".  I shouldn't say "therefore."  They've

21    agreed that it was manufactured in a state other than

22    Minnesota, and they've agreed that the firearm meets the

23    definition of a firearm.  Is that right, counsel?

24                MR. HOLLENHORST:  Yes, Your Honor.

25                THE COURT:  Okay.

1              If all these elements have been proved beyond a

2     reasonable doubt as to the defendant, then you must find the

3     defendant guilty of the crime charged under Count 4.

4     Otherwise, you must find the Defendant not guilty of this

5     crime and record your verdict in paragraph 4 of the verdict

6     form.

7              The indictment charges that the offenses allege

8     were committed on or about a certain date.  Although it is

9     necessary for the government to prove beyond a reasonable

10    doubt that an offense was committed on a date reasonably

11    near the date alleged in the indictment, it is not necessary

12    for the government to prove that the offense was committed

13    precisely on the date charged.

14             I've used the term "reasonable doubt."  Reasonable

15    doubt is a doubt based upon reason and common sense and not

16    doubt based on speculation.  A reasonable doubt may arise

17    from careful and impartial consideration of all of the

18    evidence or from a lack of evidence.  Proof beyond a

19    reasonable doubt is proof of such a convincing character

20    that a reasonable person after careful consideration would

21    not hesitate to rely and act upon that proof in life's most

22    important decisions.  Proof beyond a reasonable doubt is

23    proof that leaves you firmly convinced of the defendant's

24    guilt.  Proof beyond a reasonable doubt does not mean proof

25    beyond all possible doubt.

320

1          The government and defendant have stipulated or

2     agreed that certain facts are agreed to and, therefore, you

3     have to treat those facts as having been proved.

4          Intent or knowledge can be proved like anything

5     else.  You may consider any statements made and acts done by

6     the defendant and all of the facts and circumstances in

7     evidence that may aid in determining what the defendant's

8     knowledge or intent was.  You may but are not required to

9     infer that a person intends the natural probable

10    consequences of acts that they do knowingly or knowingly do

11    not do.

12         You are about to retire for your deliberations.

13    And in conducting your deliberations, there are certain

14    rules for you to follow, and I'm just going to list those

15    for you now.

16         First, when you go to the jury room, select one of

17    your members as your foreperson.  That's the person who will

18    preside over your discussions and speak for you here in

19    court.

20         Second, it's your duty as jurors to discuss the

21    case with one another in the jury room, try to reach

22    agreement if you can do so without violence to your

23    individual judgment because the verdict, whether it's guilty

24    or not guilty, has to be unanimous.

25         Each of you must make your own conscientious

1    decision but only after you've considered all the evidence,

2    discussed it fully with your fellow jurors, and listened to

3    the views of your fellow jurors.

4          Don't be afraid to change your opinions if the

5    discussion persuades you that you should.  But don't come to

6    a decision just because other jurors think it's right or

7    just to reach a verdict.

8          Third, if the defendant is found guilty, the

9    sentence to be imposed is my responsibility.  You must not

10   consider punishment in any way in deciding whether the

11   government has proved its case beyond a reasonable doubt.

12         Fourth, if you need to communicate with me during

13   your deliberations, you may send a note through the marshal

14   or bailiff signed by one or more of the jurors.  And I'll

15   respond as soon as possible either in writing or orally here

16   in open court.  Do not tell anyone, including me how your

17   votes stand numerically.

18         Your verdict has to be based solely on the

19   evidence and the law that I've given you in these

20   instructions.  The verdict whether guilty or not guilty must

21   be unanimous.  Nothing I have said or done is intended to

22   suggest what your verdict should be.  That is entirely for

23   you to decide.

24         Finally, a verdict form is simply the written

25   notice of the decision that you reach in this case.  You

1    take this form.  Here it is.  And you take it to the jury

2    room and when each of you has agreed on the verdict, your

3    foreperson will fill in the form, sign and date it, and

4    advise the marshal or bailiff that you're ready to return to

5    the courtroom.

6             The verdict form, United States of America versus

7    Derrick Maurice Scott.  It says, "Verdict Form.  Count 1,

8    We, the jury, unanimously find the Defendant Derrick Maurice

9    Scott," and then there's lines guilty, not guilty, of the

10   crime charged in Count 1.

11            "Count 2, possession of a machine gun.  We

12   unanimously find the defendant," and then there's lines for

13   guilty or not guilty, of the crime.

14            And then is the instruction, "If you unanimously

15   find the defendant guilty on Count 2, then complete 2B and

16   2C, otherwise skip 2B and 2C and go to Count 3."

17            And then here, this is on the second page, 2B is,

18   "we, the jury, unanimously find that the defendant Derrick

19   Maurice Scott," and then you select one or more, but as I

20   said before, you have to be unanimous on what you select,

21   and that's true for 2C as well.

22            And then Count 3, possession of a machine gun.

23            Same thing as Count 4.  Same thing, lines.  And

24   then there's a place to date and then a line for the

25   foreperson to sign.

1          And you will know from the oath about to be taken

2     by the court security officer that no one is allowed to

3     communicate with you during your deliberations.  And you

4     must not communicate the state of your deliberations to

5     anyone including me.

6          Would you come forward please?  The court security

7     officer I need to swear.

8          Raise your right hand, please.

9          (Court security officer sworn by the Court. )

10

11          THE COURT:  Thank you very much.  Here, I'll give

12     you the verdict form.

13          Thank you very much.  Members of the jury, please

14     return to the jury room.  And we will see you once you have

15     reached a verdict.

16          All rise for the jury.

17               (Jury out at 10:42 a.m.)

18          IN OPEN COURT WITHOUT JURY PRESENT

19                    (10:42 a.m.)

20          THE COURT:  Please be seated.  Anything from

21     counsel before we go through the exhibits and send them

22     back?

23          MR. DEVORE:  No, Your Honor.

24          MR. HOLLENHORST:  No, Your Honor.

25          THE COURT:  All right.  Why don't you just go

```
 1    through the exhibits with John, and he'll bring them back to

 2    the court security officer.  Thank you very much.  And,

 3    Mr. DeVore, make sure we've got your cell phone, will you?

 4            MR. DEVORE:  Yes.

 5            THE COURT:  All right.  Perfect.  Thank you very

 6    much.

 7            MR. DEVORE:  I'll come right back here after I

 8    finish.

 9            THE COURT:  That's great.  I know from Google maps

10    that you'll be on the road for 34 minutes each way.

11            MR. DEVORE:  Okay.

12            THE COURT:  Thanks, everybody.

13            (Recess for deliberations at 10:43 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2                       (1:20 p.m.)

 3            IN OPEN COURT WITH JURY PRESENT

 4                      JURY VERDICT

 5            THE COURT:  Please be seated.  Members of the

 6    jury, have you reached a verdict?

 7            FOREPERSON:  We have.

 8            THE COURT:  Would you hand the verdict form to the

 9    court security officer, please.

10            United States of America versus Derrick Maurice

11    Scott, Count 1:

12            We, the jury, unanimously find the Defendant

13    guilty of the crime of possession with intent to distribute

14    fentanyl.

15            Count 2, we, the jury, unanimously find the

16    Defendant guilty of the crime of possessing a machine gun in

17    furtherance of a drug-trafficking crime.

18            2B, we, the jury, unanimously find that the

19    defendant carried the firearm during and in relation to the

20    drug-trafficking crime.  So you have checked "carried", not

21    checked "possessed the firearm in furtherance of a

22    drug-trafficking crime," but yes to "carried during and in

23    relation to the drug-trafficking crime."

24            2C, we, the jury, unanimously find that the

25    Defendant knew the firearm was a machine gun and also was
```

```
1    aware of the firearm's physical characteristics that made it

2    a machine gun.

3              Count 3, we, the jury, unanimously find the

4    Defendant guilty of the crime of possessing a machine gun as

5    charged in Count 3.

6              Count 4, we, the jury, unanimously find the

7    Defendant guilty of the crime of being a felon in possession

8    of a firearm.

9              Dated today's date, 7th of February, 2023, signed

10   by the foreperson.

11             Members of the jury, is this your verdict?

12             THE JURORS:  Yes, it is.

13             THE COURT:  Did you want the jury polled?

14             MR. DEVORE:  Yes, Your Honor.

15             THE CLERK:  Members of the jury, please answer yes

16   or no as I call your name.

17             Mr. Adedayo, is this your verdict?

18             JUROR:  Yes.

19             THE CLERK:  Ms. Ait Sadiq?

20             JUROR:  Yes.

21             THE CLERK:  Mr. Amundson?

22             JUROR:  Yes.

23             THE CLERK:  Mr. Avery?

24             JUROR:  Yes.

25             THE CLERK:  Mr. Gilliland?
```

```
 1                    JUROR:  Yes.

 2                    THE CLERK:  Mr. Haagensen?

 3                    JUROR:  Yes.

 4                    THE CLERK:  Mr. Hannula?

 5                    JUROR:  Yes.

 6                    THE CLERK:  Ms. Krook?

 7                    JUROR:  Yes.

 8                    THE CLERK:  Mr. Larsen.

 9                    JUROR:  Yes.

10                    THE CLERK:  Ms. Lecy?

11                    JUROR:  Yes.

12                    THE CLERK:  Mr. Link?

13                    JUROR:  Yes.

14                    THE CLERK:  And Ms. Ristau?

15                    JUROR:  Yes.

16                    THE CLERK:  Your Honor, the jury has been polled,

17        and they all concur.

18                    THE COURT:  Thank you very much.

19                    Members of the jury, this concludes your jury

20        service.  Thank you very much for your attention in this

21        case.

22                    I have just a couple minutes of work to do yet

23        here in the courtroom but I will be back there.  I have your

24        certificates.  I'll be back in just a couple minutes, but we

25        really appreciate your attention, your showing up here
```

1    bright and early this morning, and your just willingness to

2    serve and your actual service.  Much appreciated.

3                   Please rise for the jury.

4                        (Jury out at 1:25 p.m.)

5

6              IN OPEN COURT WITHOUT JURY PRESENT

7              THE COURT:  Thank you, please be seated.

8              The exhibits will be taken by the government and

9    retained.

10             MR. HOLLENHORST:  Yes, Your Honor.

11             THE COURT:  In the government's possession.

12             Mr. Scott, the next thing that happens is the

13   probation officer will prepare a Presentence Investigation

14   Report.  You and your lawyer should cooperate with them as

15   they put it together.  Also, read it over when it's

16   finished, make sure there aren't any mistakes in it.  And if

17   there are, you can probably get those worked out informally

18   ahead of time.  And if not, if you can't get them worked out

19   then you can bring them to my attention during sentencing.

20             Mr. DeVore, is there anything else at this point?

21             MR. DEVORE:  No, Your Honor.

22             THE COURT:  Thank you very much for your service

23   in this case and for the extra work that you had to do.  I

24   know you had another case and you had to go to work last

25   night and drive out to Carver County, so thank you very much

1    for your courtesies.

2            Mr. Hollenhorst, Ms. Walcker, anything from the

3    government?

4            MR. HOLLENHORST:  Nothing more, Your Honor.

5            THE COURT:  Okay.  Thank you very much.  I

6    appreciate your efficiencies and courtesies.  We're in

7    recess.

8                    (Court adjourned at 1:27 p.m.)

9

10                    *      *      *

11                    **REPORTER'S CERTIFICATE**

12

13          I, MARIA V. WEINBECK, RMR, FCRR, certify that the

14    foregoing is a true and accurate transcript of my

15    stenographic notes, and is a full, true, and complete

16    transcript from the proceedings produced to the best of my

17    ability.

18            Certified by:  _s/ Maria V. Weinbeck_
                             Maria V. Weinbeck, RMR-FCRR
19

20

21

22

23

24

25